**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

```
-------------------------------------------------------------X
JOHN DOE,                              :      Civil Action No.
                                       :
                    Plaintiff,         :
                                       :      JURY TRIAL DEMANDED
          v.                           :
                                       :
PRINCETON UNIVERSITY,                  :
MICHELE MINTER, REGAN HUNT             :
CROTTY,  JOYCE CHEN SHUEH,             :
WALTER WRIGHT, COLE M.                 :
CRITTENDEN, KATHLEEN DEIGNAN,          :
W. ROCHELLE CALHOUN,                   :
JILL S. DOLAN, and SARAH-JANE LESLIE,  :
                                       :
                    Defendants.        :
-------------------------------------------------------------X
```

## COMPLAINT

Plaintiff John Doe[1] ("Plaintiff" or "Doe"), by his attorneys Nesenoff & Miltenberg, LLP, as and for his complaint against Defendants Princeton University ("Princeton" or "the University"), Michele Minter ("Minter"), Regan Hunt Crotty ("Crotty"), Joyce Chen Shueh ("Shueh"), Walter Wright ("Wright"), Cole M. Crittenden ("Crittenden"), Kathleen Deignan ("Deignan"), W. Rochelle Calhoun ("Calhoun"), Jill S. Dolan ("Dolan"), and Sarah-Jane Leslie ("Leslie") (hereinafter collectively referred to as "Defendants"), respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.     This case arises out of the biased, illegal, and improper actions and inactions of Defendants in sloppily investigating and wrongly adjudicating false allegations made against Plaintiff, a male undergraduate student at Princeton with a spotless disciplinary record, during the second semester of his senior year, concerning alleged violations of Princeton's Sexual

_____

[1] Plaintiff has filed herewith a motion to proceed by pseudonym.

Discrimination and Sexual Misconduct Policy (the "Policy") stemming from his dating relationship with Alex Roe,[2] a fellow undergraduate student at Princeton.

2.      Plaintiff and Roe dated on and off from Plaintiff's sophomore year through his senior year at Princeton.  At one point in their relationship, Plaintiff cheated on Roe, and Roe never truly forgave him.  Although Plaintiff cared deeply for Roe, Roe's constant emotional manipulation, mind-games, and unceasing punishment of Plaintiff for his transgression eventually led Plaintiff to end their relationship.  When Plaintiff first tried to break up with Roe—on or about November 3, 2017—Roe refused to accept it and coerced Plaintiff into one last sexual encounter.  For several more weeks, Plaintiff and Roe maintained a distant friendship, until about December 5, 2017, when Plaintiff told Roe, in no uncertain terms, that Plaintiff did not love Roe anymore and did not want to keep working on their relationship.

3.      In the weeks following Plaintiff's first and second break-up conversation with Roe, Roe began telling other students, including mutual friends of Plaintiff and Roe, that Plaintiff had sexually assaulted Roe.  Roe told various people conflicting stories: Roe told some people that it was non-consensual intercourse, specifically using the term "rape", whereas Roe told others that it was non-consensual digital penetration, and others still that Roe was not sure whether any penetration occurred.  Roe told some people that Plaintiff pinned Roe down, but told others that Roe initially said no and then said yes.  Roe told some people that it was a single occasion, but told others it was multiple occasions.  Roe told some people that it happened the

---

[2] Roe is referred to herein pseudonymously.  Roe—who is biologically female, and presented and identified as female when Roe first entered Princeton—experimented with different preferred names and gender pronouns over the years, which Plaintiff respectfully obliged.  When Roe initiated Title IX proceedings against Plaintiff, Roe stated that Roe preferred either non-gendered pronouns "they/them/their" or male pronouns.  In the interest of clarity and consistency, Roe will be referred to throughout this Complaint as "Roe," without the use of pronouns.

night <u>after</u> Plaintiff first broke up with Roe, while Roe told others that it happened that same night.  These rumors, which started exclusively <u>after</u> Plaintiff broke up with Roe, continued to circulate, spread, and cause considerable damage to Plaintiff's reputation, friendships, and social life at Princeton—including his expulsion/forced withdrawal from a school club in which he and Roe were both members.

4.     In February 2018, when Roe found out that Plaintiff was dating someone new, Roe told Plaintiff's new girlfriend about the alleged assault/s.  Roe also, for the first time, confronted Plaintiff about the allegations, and demanded an apology.  Plaintiff refused to take responsibility for alleged sexual assaults that never happened.

5.     Notably, Roe's claims were the first time in Plaintiff's entire life that he was accused of <u>any</u> sort of wrongdoing.  Indeed, he had never so much as gotten a detention, been in a fight, or been reprimanded in any way, for any reason, at any school, job, or otherwise.

6.     In March 2018, Roe filed a Title IX complaint against Plaintiff, alleging that on November 4, 2017—the day <u>after</u> Plaintiff and Roe's last sexual encounter—Plaintiff kissed Roe, touched Roe's breasts, buttocks, and vagina, and digitally penetrated Roe's vagina without consent.

7.     Princeton's subsequent Title IX investigation and disciplinary process was flawed, biased, and deficient.  Throughout the Title IX disciplinary process, Plaintiff was subjected to unfair and gender-biased, treatment:  Plaintiff was presumed guilty from the start; Defendants resolved all factual inconsistencies in favor of Roe's claims, despite patent evidence of credibility issues; the evidence was twisted and distorted to match Roe's nebulous and shifting narrative; evidence which could have supported either party's claim was found to support Roe and contradict Plaintiff; evidence bearing heavily on Roe's credibility was not considered or

given proper weight; Defendants withheld evidence and witness identities from Plaintiff; Defendants refused to interview witnesses requested by Plaintiff; Defendants refused to investigate Plaintiff's sexual assault claim against Roe; and, overall, the investigative report was tailored towards a predetermined outcome of finding Plaintiff guilty as a male accused, regardless of the actual facts of the case.

8.      As a result of this flawed process, Plaintiff was found responsible for non-consensual sexual contact.  However, due to Roe's admission to the Title IX Panel that Roe could not remember whether any penetration occurred, Plaintiff was found not responsible for nonconsensual intercourse.  Notably, despite the Panel's acknowledgment of Roe's wavering and inconsistent claims, the Panel was determined to find Plaintiff responsible for some violation or another, in order to prove Princeton's dedication to prosecuting males accused of sexual misconduct to the utmost—irrespective of whether an assault truly occurred.

9.      Based on the improper finding of responsibility, Princeton refused to timely award Plaintiff his hard-earned undergraduate degree, for which he had completed all requirements, and which should have been awarded in June 2018.  Instead, Princeton withheld Plaintiff's degree until January 2019 and has placed a notation on Plaintiff's transcript indicating that his degree was withheld, forever marring his educational file with an improper and damaging sanction, and severely damaging Plaintiff's future educational and career prospects.

10.     Princeton's disciplinary process against Plaintiff was replete with errors, including but not limited to Defendants':

      a.   failure to conduct a fair, impartial, and timely investigation;

      b.   failure to investigate a reported act of sexual assault by Roe;

    c.   failure to properly apply the preponderance of the evidence standard as the burden of proof;

    d.   failure to disclose and provide Plaintiff with Roe's initial statement/complaint;

    e.   failure to disclose and provide Plaintiff with the identity and statements of potentially exculpatory witnesses/evidence;

    f.   failure to provide Plaintiff with evidence upon which the Title IX Panel relied in reaching its conclusion;

    g.   reliance on hearsay statement witnesses who simply repeated Roe's claims, and in fact, made clear that Roe had made numerous, inconsistent claims; and

    h.   abuse of discretion in the issuance of an unduly harsh and unwarranted sanction that did not take into account the individual facts of the case.

11.    By employing gender-based, pre-determined presumptions of Plaintiff's guilt from the outset, and by imposing an unreasonable sanction, and by selectively enforcing the Policy as between similarly situated male and non-male students, Defendants displayed anti-male discriminatory bias, leading to an erroneous outcome and selective enforcement in violation of Title IX of the Education Amendments of 1972.

12.    By violating their own policies and depriving Plaintiff of a fair and impartial disciplinary process, Defendants breached express and implied agreements with Plaintiff and acted in bad faith in failing to fulfill their promises to him as an enrolled student paying tuition at Princeton.

13.    By engaging in a biased, flawed, and deficient investigation and disciplinary process, the finding and sanction were arbitrary, capricious, unreasonable,  fundamentally unfair, and not supported by sufficient evidence.

14.     As a result of Defendants' discriminatory and unlawful conduct, Plaintiff has sustained damages, including but not limited to past and future economic losses, reputational harm, and diminished/lost future educational and career prospects.

15.     Accordingly, Plaintiff brings this action to obtain monetary and injunctive relief.

## PARTIES

16.     Plaintiff is a natural person and a resident of Colorado.  At all relevant times herein, Plaintiff was an enrolled undergraduate student at Princeton University with an expected graduation date of June 2018.

17.     Defendant Princeton University is a partially federally funded private university located in Princeton, New Jersey, where it maintains its principal offices and place of business.

18.     Defendant Michele Minter is a natural person and, at all times relevant herein, was the Vice Provost for Institutional Equity and Diversity at Princeton.  On information and belief, Minter is a resident of New Jersey.

19.     Defendant Regan Hunt Crotty is a natural person and, at all relevant times herein, was the Director of Title IX Administration at Princeton.  Defendant Crotty served as a member of the three-person panel assigned to investigate and adjudicate Roe's claims against Plaintiff (the "Title IX Panel" or "Panel").  On information and belief, Crotty is a resident of New Jersey.

20.     Defendant Joyce Chen Shueh is a natural person and, at all relevant times herein, was the Senior Associate Dean of Undergraduate Studies at Princeton.  Defendant Shueh served as a member of the three-person panel assigned to investigate and adjudicate Roe's claims against Plaintiff.  On information and belief, Shueh is a resident of New Jersey.

21.     Defendant Walter Wright is a natural person and, at all relevant times herein, was a Title IX Investigator at Princeton.  Wright served as a member of the three-person panel

assigned to investigate and adjudicate Roe's claims against Plaintiff. On information and belief, Wright is a resident of New Jersey.

22.     Defendant Cole M. Crittenden is a natural person and, at all relevant times herein, was Deputy Dean of the Graduate School at Princeton. Crittenden served on the panel that imposed the disciplinary sanction against Plaintiff. On information and belief, Crittendon is a resident of New Jersey.

23.     Defendant Kathleen Deignan is a natural person and, at all relevant times herein, was the Dean of Undergraduate Students at Princeton. Deignan served on the panel that imposed the disciplinary sanction against Plaintiff. On information and belief, Deignan is a resident of New Jersey.

24.     Defendant W. Rochelle Calhoun is a natural person and, all all relevant times herein, was the Vice President for Campus Life at Princeton. Calhoun served as a member of the Student Appeals Committee that considered and ultimately denied Plaintiff's appeal of Princeton's disciplinary decision and penalty. On information and belief, Calhoun is a resident of New Jersey.

25.     Defendant Jill S. Dolan is a natural person and, at all relevant times herein, was the Dean of the College at Princeton. Dolan served as a member of the Student Appeals Committee that considered and ultimately denied Plaintiff's appeal of Princeton's disciplinary decision and penalty. On information and belief, Dolan is a resident of New Jersey.

26.     Defendant Sarah-Jane Leslie is a natural person and, at all times relevant herein, was the Vice President for Campus Life, at Princeton. Leslie served as a member of the Student Appeals Committee that considered and ultimately denied Plaintiff's appeal of the disciplinary decision and penalty. On information and belief, Leslie is a resident of New Jersey.

## JURISDICTION AND VENUE

27.     This Court has federal question, diversity, and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. § 1367 because: (i) the claims arise under the constitution and statutes of the United States; (ii) Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000; and (iii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

28.     This Court has personal jurisdiction over Defendant Princeton because Princeton is located within and conducts business in this judicial district.

29.     This Court has personal jurisdiction over Defendants Minter, Crotty, Shueh, Wright, Crittenden, Deignan, Calhoun, Dolan, and Leslie on the ground that they were employed by Princeton and conducted business in New Jersey at all times relevant herein, and, upon information and belief, reside within the state of New Jersey.

30.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because the acts or omissions giving rise to Plaintiff's claims occurred in this judicial district, and witnesses and evidence relevant hereto are located within this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.  BACKGROUND.

#### A. The April 2011 "Dear Colleague Letter": The Office for Civil Rights Places Pressure on Universities to Aggressively Pursue Sexual Misconduct Complaints.

31.     On April 4, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "April 2011 Dear Colleague Letter" (the "DCL").

32.     The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972 and its regulations.

33.     The DCL directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects."  DCL at 4.

34.     The DCL responded, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity, which proclaimed a campus rape epidemic and criticized the OCR for its lax response to what the report characterized as a social problem of critical importance. *See* Joseph Shapiro, *Campus Rape Victims: A Struggle for Justice*, National Public Radio (Feb. 24, 2010), http://www.npr.org/templates/story/story.php?storyId=124001493.   The report described in detail the obstacles faced by sexual assault victims in obtaining redress though college disciplinary proceedings, and how victims who did engage in the college disciplinary process suffered additional trauma as a result. Much of the report focused on underreporting, re-traumatization of victims, rape myth adherence on college campuses, and young men's cultural adherence to the sexual aggressor role.

35.     The OCR further relied on faulty statistics in sounding its "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college."  DCL at 2. The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study, and warned that it was "inappropriate to use the 1-in-5 number as a baseline . . . when discussing our country's problem with rape and sexual assault on campus." *See* Christopher Krebs and Christine Lindquist, *Setting the Record Straight on "1 in 5,"* Time Magazine (Dec. 14, 2015), http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/.

36.     Relying on the faulty one-in-five statistic, the OCR, through the DCL, minimized due process protections for the accused by, among other things, mandating the adoption of a relatively low burden of proof—"more likely than not"— in cases involving sexual misconduct, expressly prohibiting colleges from applying a higher standard of proof and "strongly discourag[ing]" the use of cross-examination and other crucial methods for testing complainant credibility.

37.     The DCL advised that schools should "minimize the burden on the complainant" and focus on victim advocacy.  For example, it stated that schools should give both parties the right to appeal a decision – in other words, if an accused student was found not responsible, the complainant could then appeal and force the respondent to defend the claims all over again, functionally constituting double-jeopardy.

38.     Despite its purported purpose as a mere guidance letter, the Department of Education treated the DCL as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus.

39.     On April 19, 2014, the OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* (the "2014 Q&A").

40.     Like the DCL, the 2014 Q&A was aimed at addressing educational institutions' sexual misconduct policies, including the procedures schools "must" have in place "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence."  The 2014 Q&A advised schools to adopt a "trauma-informed" approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." 2014 Q&A at 31.  The

Q&A further advised that, although "the rights established under Title IX must be interpreted consistently with any federally guaranteed due process rights … a school should ensure that any due process rights do not restrict or unnecessarily delay the protections provided by Title IX <u>to the complainant</u>."  2014 Q&A at 13 (emphasis added).

41.     In the same month that the OCR issued its 2014 Q&A on Title IX, the White House issued a report titled *Not Alone*, prepared by the White House Task Force to Protect Students from Sexual Assault, which included a warning that if the OCR finds a school in violation of Title IX, the "school risks losing federal funds." *See* White House Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014), available at https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf.   The report further advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could therefore initiate investigation, compliance review, and/or litigation against schools suspected of violating Title IX.

42.     In June 2014, then-Assistant Secretary of Education Catherine Lhamon testified before the United States Senate, warning that if the OCR could not secure voluntary compliance with the DCL from a college or university, it could elect to initiate an administrative action to terminate federal funds or refer the case to the Department of Justice.

43.     To support its enforcement of the DCL, the OCR hired hundreds of additional investigators.  To date, OCR has conducted <u>over five hundred</u> investigations of colleges for the potential mishandling of complaints of sexual misconduct--including Princeton, which was the subject of three separate complaints filed in 2010 and 2011.  *See Title IX: Tracking Sexual Assault Investigations*, Chronicle of Higher Education, https://projects.chronicle.com/titleix/ (last visited February 1, 2019); OCR Determination Letter to Princeton (Nov. 5, 2014), *available at*

https://assets.documentcloud.org/documents/2644774/OCR-Determination-Letter-to-Princeton.pdf.

44.     The threat of revocation of federal funds—the ultimate penalty—was a powerful tool in motivating colleges to aggressively pursue and punish male students accused of sexual misconduct.  In that regard, Anne Neal, of the American Council of Trustees and Alumni, observed:  "There is a certain hysteria in the air on this topic, … It's really a surreal situation, I think." *See* Tovia Smith, *How Campus Sexual Assaults Came to Command New Attention*," National Public Radio (Aug.12, 2014), https://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention.  Neal explained that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead."

45.     Robert Dana, Dean of Students at the University of Maine, echoed the sentiment that a fear of governmental intervention and withdrawal of funds could lead colleges to rush to judgment against male students in disciplinary proceedings.  *See* Tovia Smith, *Some Accused of Sexual Assault on Campus Say System Works Against Them*, National Public Radio (Sept. 3, 2014), https://www.npr.org/2014/09/03/345312997/some-accused-of-campus-assault-say-the-system-works-against-them.  Dana told NPR, "[c]olleges and universities are getting very jittery about it." *Id.*

46.     Likewise, on September 1, 2014, the Chronicle of Higher Education noted that colleges were facing "increasing pressure from survivors and the federal government," including claims that college campuses had become "hazardous places" for female students.  *See* Robin Wilson, *Presumed Guilty: College Men Accused of Rape Say the Scales are Tipped Against Them*, Chronicle of Higher Education (Sept. 1, 2014),

https://www.chronicle.com/article/Presumed-Guilty/148529.  For example, the article noted that different standards were being applied to male students versus female students:  "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no.  That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent."  *Id.*

47.    Indeed, this precise issue came to a head in a series of events that took place just weeks after this article was published:  In late September 2014, at Miami University, Ohio, a female and male student engaged in various sexual acts while <u>both</u> claimed to be intoxicated; the university subsequently pursued sanctions against the male student, but not against the similarly situated female student.  *See Doe v. Miami Univ.*, 882 F.3d 579, 596 (6th Cir. 2018).  In a decision issued recently in that case, the Sixth Circuit Court of Appeals found the male student sufficiently alleged gender-based unequal treatment as a result of the college's refusal to pursue disciplinary action against the female student for the same conduct on which it based disciplinary action against plaintiff, the male student.

48.    Notably, a recent study by the National Bureau of Economic Research found that opening more Title IX investigations benefits colleges in their application submission rates, and has no negative impact on securing donations.  The study found "no evidence [that] federal Title IX investigations reduce students' interest in a university.  Instead, [it found] evidence that these investigations increase freshman applications and enrollment, for both female and male students." *See* Jason M. Lindo, *et al.*, *Any Press is Good Press? The Unanticipated Effect of Title IX Investigations on University Outcomes*, National Bureau of Economic Research, Working

Paper No. 24852 (July 2018), http://www.nber.org/papers/w24852. The study further found that "[f]ederal Title IX investigations appear to have no effect on student retention, as the enrollment of continuing students is unaffected," and that "analysis of . . . data suggests that federal Title IX investigations have no detectable effects on donations." *Id.*

### B. The 2017 Revocation of the DCL and Princeton's Refusal to Update its Policies Accordingly.

49.    On September 22, 2017, the OCR rescinded the DCL and put in place interim guidance (the "2017 Q&A"), while the current administration reviews and revises its practices regarding the adjudication of complaints of sexual misconduct on college campuses receiving federal funding. *See* Dep't of Ed*., Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

50.    As Secretary of Education, Betsy DeVos, noted, the rescission of the DCL was largely motivated by "[t]he truth … that the system established by the prior administration has failed too many students," specifically because "[t]he notion that a school must diminish due process rights to better serve the 'victim' only creates more victims." Press Release, Secretary DeVos Prepared Remarks on Title IX Enforcement (Sept. 7, 2017), available at https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

51.    The 2017 Q&A, in a significant departure from the 2011 DCL, permits colleges to utilize a higher burden of proof than "preponderance of the evidence" when adjudicating sexual misconduct; it also emphasizes the need for equal rights under Title IX proceedings, mandating that "[a]ny rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms." 2017 Q&A at 4.

52.    The 2017 Q&A also directs that "[w]hether or not a student files a complaint of alleged sexual misconduct or otherwise asks the school to take action, where the school knows or

reasonably should know of an incident of sexual misconduct, the school <u>must take steps to understand what occurred and to respond appropriately</u>." 2017 Q&A at 1 (emphasis added).

53.     The 2017 Q&A further directs that colleges "must adopt and publish grievance procedures that provide for a <u>prompt and equitable</u> resolution of complaints of sex discrimination, including sexual misconduct." *Id.* at 3 (emphasis added). In that regard, the "elements in evaluating whether a school's grievance procedures are prompt and equitable[] includ[e] whether the school (i) provides notice of the school's grievance procedures, . . . ; (ii) applies the grievance procedures to complaints filed . . . ; [and] (iii) ensures an adequate, reliable, and impartial investigation of complaints, <u>including the opportunity to present witnesses and other evidence</u>." *Ibid.* (emphasis added).

54.     With respect to investigation, the 2017 Q&A requires "[a] person free of actual or reasonably perceived conflicts of interest and biases for or against any party [to] lead the investigation on behalf of the school." *Id.* at 4.

55.     The 2017 Q&A also requires investigators to "synthesize <u>all available evidence</u>—including both inculpatory and exculpatory evidence—and take into account the unique and complex circumstances of each case." *Id.* at 4 (emphasis added).

56.     Critically, the 2017 Q&A directs that, once a school "decides to open an investigation that may lead to disciplinary action against the responding party, [the] school should provide <u>written notice</u> to the responding party of the allegations constituting a potential violation of the school's sexual misconduct policy, including sufficient details and with sufficient time to prepare a response <u>before any initial interview</u>." *Id.* at 4 (emphasis added).

57.     As the 2017 Q&A goes on to explain, "[s]ufficient details include the identities of the parties involved, the specific section of the code of conduct allegedly violated, the precise

conduct allegedly constituting the potential violation, and the date and location of the alleged incident." *Ibid.* In addition, "[e]ach party should receive written notice in advance of any interview or hearing <u>with sufficient time to prepare for meaningful participation</u>. The investigation should result in a written report summarizing the relevant exculpatory and inculpatory evidence. The reporting and responding parties and appropriate officials <u>must have timely and equal access to any information that will be used</u> during informal and formal disciplinary meetings and hearings." *Ibid.* (emphasis added).

58.     The 2017 Q&A suggests that the policies and procedures in place at Princeton at all times relevant to this lawsuit – which were tailored in such a way as to comply with the DCL under the threat of loss of federal funding – were unfair and, ultimately, contrary to the goal of gender equality in Title IX proceedings.

59.      Despite the sweeping changes caused by the rescission of the 2011 DCL and the implementation of the 2017 Q&A, Princeton administrators, including defendant Minter, stated Princeton would not change its policies and procedures. *See Letter to the Editor: SHARE Statement on Title IX*, The Daily Princetonian (Nov. 15, 2007), http://www.dailyprincetonian.com/article/2017/11/share-title-ix.

### C. Princeton Faces Years of Complaints for Failure to Address Claims of Sexual Assault and Harassment <u>Allegedly Committed by Male Students and/or Faculty.</u>

60.     Right around the time that the OCR was promulgating and implementing the 2011 DCL, Princeton was under heavy fire for its alleged failure to properly respond to and redress female students' claims of sexual assault and sexual harassment by male students and/or faculty.

61.     Indeed, in 2010 and 2011, three separate complaints were filed by or on behalf of female students to the OCR, accusing Princeton of insufficiently responding to claims of sexual

assault and harassment.   On information and belief, the people accused of assault and/or harassment in all of these cases were male.

62.     In response to the three complaints, OCR launched an extensive, nearly four-year investigation into Princeton's policies and practices in handling sexual misconduct claims, which included student interviews, document and file review, and on-site visits.

63.     As a result of the investigation, OCR concluded that Princeton was in violation of Title IX for failing to adequately respond to and redress the female students' claims of sexual misconduct.   Specifically, OCR held Princeton's standard of evidence for adjudicating such claims—a "clear and persuasive" standard—was impermissibly high, and constituted a violation of Title IX.   As a result of this finding, OCR required Princeton to adopt a lower burden of proof—preponderance of the evidence—making it easier to find respondents, who are primarily male, responsible for policy violations.

64.     On information and belief, in resolving the OCR complaint, Princeton agreed to, among other things, reimburse the tuition for three female students who had filed complaints.

65.     Princeton also agreed to provide OCR with documentation of its response to and handling of reports of sexual misconduct.

66.     As a result of the 2014 OCR resolution agreement, Princeton was under enormous pressure to respond aggressively to claims of sexual misconduct, specifically misconduct allegedly committed by male students and faculty.

67.     Even after the 2014 OCR resolution agreement, Princeton continued to face pressure to heavily prosecute and punish males accused of sexual misconduct.

68.     On November 5, 2014—the very day the OCR issued its findings that Princeton had failed to adequately respond to allegations of assault by female students—a news article was

published alleging sexual misconduct at one of Princeton's "eating clubs", the Tiger Inn, that "an intoxicated first year female student" was photographed performing a sex act, and the photograph was subsequently distributed. *See* Peter Jacobs, *Princeton Eating Club Under Investigation For Allegedly Distributing Photo Of Lewd Sex Act*, Business Insider (Nov. 5, 2014), https://www.businessinsider.com/princeton-eating-club-under-investigation-for-allegedly-distributing-photo-of-sexual-assault-2014-11.

69.    On information and belief, in September 2015, a male Princeton student filed a complaint with OCR similarly alleging that Princeton failed to adequately respond to his claims of sexual assault by a male student.

70.    On information and belief, in May 2016, another complaint was filed with OCR alleging Princeton failed to adequately respond to a female student's claims of sexual misconduct by a male.  On information and belief, OCR opened a new investigation at Princeton in August 2016.  On information and belief, this investigation is still ongoing.

71.    In 2017, Princeton was again in hot water due to an alleged sexual misconduct scandal—this time, between a female graduate student and a male faculty member.  After Princeton initially declined to terminate the faculty member, the female complainant initiated a full-on media blitz and campus movement condemning Princeton's seemingly "lax" response to her harassment claims, which led to numerous student meetings, op-eds, petitions and boycotts, and mass-letter writing campaigns lambasting Princeton for imposing anything less than termination of the male faculty member.  Indeed, due to the massive backlash Princeton faced for its decision not to impose the harshest penalty possible on the male respondent, Princeton subsequently changed it policies to impose a default sanction of suspension for violations of the sexual harassment policy, regardless of the individual facts of the case.

72.     In an editorial published in the Daily Princetonian discussing the 2017 Q&A and Princeton's response of not changing its policies, one Princeton student observed: "The University, with its $25.9 billion dollar endowment, well-connected alumni, and strongly-opinionated student body, would likely face severe public backlash, as it has in the past, if it rolled back its Title IX protections for students. With a faculty-student sex scandal in 2017 and two others in 2014, the University's public image has the potential to be tainted more by lax Title IX enforcement . . . ."  Jasman Singh, *Title IX Changes Are Going to Hurt Those that Need the Enforcement the Most*, The Daily Princetonian (Nov. 28, 2018), http://www.dailyprincetonian.com/article/2018/11/title-ix-changes-are-going-to-hurt-those-that-need-the-enforcement-the-most.

73.     Singh continued, "DeVos's Title IX reform seeks to hinder the progress that today's #MeToo movement has made in creating transparency and exposing corruption and abuse at the highest levels of our society.  With a nationally covered faculty-student sex scandal in 2017, the wound is fresh for Princeton . . . ."  *Id.*

74.     On information and belief, Princeton's history of complaints, OCR investigations, considerable bad press, and heavy student criticism regarding its perceived mishandling of claims of sexual misconduct committed by male students and faculty—which continued through the time period of Roe's complaint against Plaintiff—placed extremely heavy pressure on Princeton to "over-correct" by favoring protection of female students and finding male respondents guilty regardless of the facts of the case.

75.     Indeed, on information and belief, on July 28, 2018, OCR opened an investigation of potential gender bias stemming from Princeton's offering of a Rape Aggression Defense System course only to female students.  The course description described the disputed program

as "dedicated to teaching women defensive concepts and techniques against various types of assault." *See* Philip Sean Curran, *University Programs Under Fire for Title IX Complaints*, The Princeton Packet (Aug. 3, 2018) (emphasis added), *available at* https://issuu.com/centraljersey.com-newspapers/docs/pp_08-03-18.

76.      Likewise, according to Princeton's 2017 We Speak report, assessing campus climate survey results, approximately 8% of male undergraduates reported experiencing nonconsensual sexual contact, and approximately 44% of male students who reported experiencing sexual misconduct stated it was perpetrated by women.  Notably, the percentage of male students who believe that Princeton does not hold perpetrators of sexual misconduct accountable for their actions was nearly double the percentage of female students who felt that way.  Taken together, these statistics imply that Title IX complaints against female students are pursued at a lower rate, and female respondents are found responsible at a lesser rate and sanctioned less harshly than male students accused of sexual misconduct.

77.      On information and belief, in addition to the threat of bad press, campus unrest, and the loss of federal funding, Princeton also faced the threat of additional financial losses, such as the tuition reimbursements resulting from the 2014 OCR resolution, if it failed to find male students accused of sexual misconduct responsible and punish them severely.

78.      On information and belief, this direct and constant pressure created an institutional bias against males accused of sexual misconduct, which infected Princeton's processes and procedures as applied to Plaintiff.

79.      On information and belief, in the time period leading up to Princeton's adjudication of the Title IX claims against Plaintiff, the internal and external pressure placed on Princeton to aggressively pursue claims of sexual misconduct allegedly committed by males lead

to an institutional bias in the process, as well as selective enforcement based on gender.

## II.  PRINCETON PROSECUTES PLAINTIFF BASED ON ROE'S RUMORS.

### A.  Plaintiff and Roe.

80.     Plaintiff matriculated to Princeton in Fall of 2014 with an expected graduation date of June 2018.

81.     Throughout Plaintiff's time at Princeton, he participated in numerous campus clubs and activities, and, apart from Roe's Title IX complaint, was never the subject of any disciplinary procedure, nor even an accusation of any sort of misconduct.

82.     In fact, Plaintiff had never been in any sort of trouble in his entire life prior to Roe's claims: he had never been in a fight, never been sent to the principal's office, never received a detention, never been arrested, and never been reprimanded.

83.     On information and belief, Roe matriculated to Princeton in Fall of 2013.  On information and belief, when Roe first came to Princeton, Roe (who is biologically female) utilized a female name and identified as female both socially and on relevant school forms.

84.     On information and belief, over time, Roe experimented with different names and preferred gender pronouns, but never substantively changed in appearance, dress, or behavior.

85.     Plaintiff and Roe met during the second semester of Plaintiff's freshman year—Spring of 2015—through their mutual participation in one of Princeton's *a capella* singing groups.

86.     When Plaintiff first met Roe, Roe presented as female.  When Roe would variously request to be called other names and gender pronouns, Plaintiff respectfully obliged. Throughout Roe and Plaintiff's relationship, notwithstanding Roe's fluctuating gender identity, Roe never really changed in appearance, and they regularly engaged in vaginal intercourse.

87.     For some time, Plaintiff and Roe engaged in a non-committal sexual relationship, which they kept mostly private.  At one point, a mutual friend of Roe and Plaintiff, Student E,[3] who was also in the *a capella* group, expressed romantic interest in Plaintiff and approached Roe for advice.  Roe did not reveal that Roe was already in a relationship with Plaintiff, so the student asked Plaintiff out.  Plaintiff rejected Student E.

88.     In the Spring of 2016, Plaintiff and Roe started dating exclusively.  For various reasons, including the desire to avoid an awkward situation in their music club because of what had happened with Student E, Plaintiff and Roe continued to keep their relationship relatively secret.  As a result of this secrecy, another student, Student N, who did not know Plaintiff and Roe were dating, expressed an interest in Plaintiff.  Plaintiff, rather than outright rejecting Student N, would text and flirt with Student N and did not tell Roe about these interactions.  Another student, Student K, also had romantic interest in Plaintiff at the time, and would flirt and text with Plaintiff.

89.     On information and belief, in the Fall of 2016, Roe, who had been struggling academically, decided to take a leave of absence from Princeton in order to avoid failing a course.  Around Thanksgiving 2016, Plaintiff and Roe agreed to have an open relationship while Roe was away, but to tell each other if they "hooked up"[4] with anyone else.  In or about December 2016, Plaintiff hooked up with Student N and did not tell Roe about it.  Eventually, Roe found out, and was, understandably, extremely upset.  Plaintiff felt terrible and apologized profusely.

---

[3] All non-party students are referred to herein by pseudonym, using the matching pseudonyms they were assigned by Princeton's Title IX Panel.

[4] "Hooking up" is a slang term referring to any form of intimate/sexual activity, ranging from kissing to intercourse.

90.     Because of Plaintiff and Roe's mutual friends and activities, Plaintiff's "affair" became something of a "scandal" among their *a capella* group, and Plaintiff, who had been elected president of the group, was essentially forced to resign his position.

91.     In the Spring 2017 semester, while Roe was on leave, Plaintiff and Roe remained in touch and eventually patched up their relationship.  Roe came back to campus to visit in the Summer of 2017, and Roe and Plaintiff hooked up a few times.

92.     On one of these occasions, Plaintiff was drinking with some friends and became severely intoxicated – he blacked out portions of the night, and only vaguely remembers acting extremely drunk, such as sitting on the ground and crying, and friends bringing him water to try and sober him up.  When he woke up the next morning, Roe was in his bed.  Plaintiff had no memory of going to bed with Roe.  On information and belief, numerous witnesses saw Roe pursuing Plaintiff while he was extremely intoxicated and incapacitated by alcohol.

93.     Throughout the relationship, Plaintiff and Roe would often have sex while Plaintiff was intoxicated and Roe was not.  On one such occasion, Plaintiff had jokingly asked Roe "is this sexual assault?" referring to the fact that Roe was having sex with Plaintiff while Plaintiff was inebriated.  However, the night in the Summer of 2017 was the first time Plaintiff was intoxicated to the point of incapacity and woke up next to Roe.

94.     Before Roe's visit in the Summer of 2017 was over, Roe told Plaintiff Roe did not love him.  Plaintiff told Roe that he cared for Roe and wanted to remain true to Roe anyway.  Roe said that was fine.  Roe and Plaintiff stayed in touch and continued to work on their relationship long-distance over the Summer of 2017.

95.     Throughout this time, Roe was increasingly erratic, distant, manipulative, and condescending towards Plaintiff, seemingly forever punishing him for his prior indiscretion, and

constantly demanding apologies for various perceived (and often non-existent) slights. Despite this behavior, Plaintiff cared deeply for Roe and continued trying to make Roe happy.

96.     In the Fall of 2017, Roe returned to Princeton, and Plaintiff and Roe began hooking up again. During this time, Roe would regularly brag to Plaintiff about hooking up with other people, including hooking up with a drunk female student who Roe said "may have been questioning her sexuality."[5]

97.     Roe also constantly berated Plaintiff in public, causing several of Plaintiff's friends to speak with him privately about their concern for Roe's manipulative and emotionally abusive behavior.  On information and belief, some of these students expressed these same concerns to Princeton's Title IX Panel.

98.     Eventually, the strain of the relationship, Roe's constant emotional manipulation, and Plaintiff's belief that Roe was romantically interested in one of Roe's other hook-ups, led Plaintiff to decide to end the relationship.

99.     On the evening of November 2/early morning of November 3, 2017, Plaintiff went to Roe's room to break up with Roe.  Roe refused to accept this, and told Plaintiff that he was being "pathetic," "petty," and "sad," and simply using an "excuse" to bail on their relationship.  Roe cajoled Plaintiff into staying.  The two eventually laid down on Roe's couch and began hooking up.  Roe stated that Roe wanted to have sex with Plaintiff, but had a urinary tract infection.  Plaintiff was relieved, as he still felt ambivalent about Roe, and told Roe it would not be a good idea for them to have sex.  Insisting on continuing their sexual encounter, Roe then offered to perform oral sex on Plaintiff.  Plaintiff accepted.

---

[5] In this situation, Roe was presumably self-identifying as female.

24

100.    Throughout this hookup, Roe talked about the other people Roe had been hooking up with, and how one of Roe's former hookups was very good at performing oral sex on Roe. Plaintiff was not sure what to make of these comments.

101.    After Roe performed oral sex on Plaintiff, their sexual encounter came to an end. Roe then asked Plaintiff if Roe could go with Plaintiff back to Plaintiff's room. This was an unusual request, as Roe regularly refused to go to Plaintiff's room because of the mess. Plaintiff acquiesced. Plaintiff and Roe returned to Plaintiff's room around 7:00am on November 3, 2017, and slept through most of the day. This was the last time Plaintiff and Roe ever hooked up.

102.    On the evening of November 3 into the morning of November 4, 2017, members of Plaintiff and Roe's *a capella* group got together in a lounge in Roe's dorm to hang out. Plaintiff and Roe both drank alcohol. Plaintiff left the get-together between 2:00am and 3:00am and went back to his room to go to sleep. The next morning, between 8:00am and 9:00am, Plaintiff left campus to travel to the University of Pennsylvania in connection with his job as a videographer for the football team.

103.    For several more weeks, Plaintiff and Roe maintained a distant friendship. On or about December 5, 2017, Plaintiff told Roe, in no uncertain terms, that Plaintiff did not love Roe anymore and did not want to keep working on their relationship—which, at that point, had spanned nearly two years and was seemingly never without drama. Roe said something along the lines of, "yeah, I figured."

### B.  Roe's Roving Rumors.

104.    Despite dating Plaintiff on and off for nearly two years without any reported incidents of sexual misconduct, within a couple of weeks of Plaintiff's first-break up conversation with Roe, Roe began to allege, for the first time ever, that Plaintiff sexually assaulted Roe.

105.    From November 2017 through February 2018, Roe told numerous of Roe and Plaintiff's mutual friends a variety of stories about the alleged assault/s.  Although some of the stories shared some common elements, no two were exactly alike.  For example:

a.  On information and belief, in November 2017, Roe told Student A that Plaintiff had "sexually assaulted and taken advantage of" Roe.  Roe first described the situation as confusing and ambiguous.  On information and belief, Roe later told Student A that the encounter began consensually, but Roe said "no" and Plaintiff did not listen, and they then engaged in "sex without consent."  Roe said the phrase "sex without consent" to Student A several times.  Roe did not specify when this alleged assault occurred.

b.  On information and belief, in November 2017, Roe told Student B that on a "recent" evening, Plaintiff "forced himself" on Roe.  Roe told Student B that Roe had told Plaintiff "no" to sex but Plaintiff ignored Roe and "rape[d]" Roe.  Roe told Student B that Roe just "gritted [Roe's] teeth until it was over" and Plaintiff "rolled off."  Roe then told Student B that there were actually numerous occasions when Roe said "no" to sex, but Plaintiff continued to pressure Roe until Roe "said yes" because Roe "had no other choice."

c.  On information and belief, in November or December 2017, Roe told Student E that one night when Plaintiff was drunk, Roe helped Plaintiff back to his room and stayed with Plaintiff to "keep an eye on him."  Roe told Student E that on that night, Plaintiff "pinned [Roe] down on the bed" and digitally penetrated Roe's vagina while Roe continually said "no."

d.  On information and belief, in or around December 2017, Roe told Student D that on the evening of November 3/morning of November 4, 2017, Roe told Plaintiff that Roe was not interested in sex, but Plaintiff "kept going."  Roe first told Student D that Plaintiff "may" have digitally penetrated Roe, but Roe could not recall.  Roe later told Student D that Roe initially said no to sex, but Plaintiff did not listen, and Roe "gave in" because it was "not worth it" to resist and Roe "might as well enjoy it."  Roe told Student D that as Plaintiff was having sex with Roe, Plaintiff asked, "is this sexual assault?", and Roe replied, "no," which Roe regretted saying.

e.  On information and belief, in December 2017, Roe told Student H that Plaintiff sexually assaulted Roe in November 2017.  Roe told Student H that Roe and Plaintiff began making out in Roe's room, but then went to Plaintiff's room because Plaintiff had a bigger bed.  Roe told Student H that, in Plaintiff's room, Roe stated Roe was not interested in intimate activity—specifically, kissing—and said "no" a few times but then said "yes."  Plaintiff and Roe then kissed for a while and went to sleep.  In March 2018, Roe then told Student H that Plaintiff had pinned Roe down on his bed and that Roe "couldn't understand how anyone could not think that the event was sexual assault."

f.  On information and belief, in December 2017, Roe told Student G—an acquaintance of Roe's but a close friend of Plaintiff's—that Plaintiff "sexually assaulted" Roe in November 2017.  Roe made this statement out of the blue while the two were eating at the same table in a dining hall, and gave no further details at the time.

g.  On information and belief, in December 2017 or January 2018, Roe told Student K that Roe was going to stop dating "straight white men," because they always ended up hurting Roe.  On information and belief, Roe then told Student K that there was an occasion when Roe said "no" to sex with Plaintiff, but Plaintiff "kept going."   Roe said that Plaintiff then asked Roe whether it was sexual assault, and Roe was not sure how Roe had responded.  In a later conversation, Roe told Student K that it was not sex, but "fingering," and that Roe initially said no to the encounter but then said "yes."

h.  In February 2018, after Roe discovered that Plaintiff had started seeing someone new, Roe told Plaintiff's new girlfriend that Plaintiff had "sexually assaulted" Roe "numerous times" and to "be safe."  Over the course of the next few weeks, Roe repeatedly pressed Plaintiff's new girlfriend to believe Roe and to talk to Plaintiff about the allegations, likely hoping that Plaintiff's girlfriend could ply some kind of admission out of Plaintiff.

106.   At the same time Roe was making these various accusations, from November through mid-December, 2017, Plaintiff and Roe continued to interact in their mutual clubs and activities.  In fact, Roe attended the New York City Thanksgiving Day Parade with Plaintiff and a couple of other students in November 2017, and gave no indication that anything was wrong.

107.   Plaintiff had no idea that there was any issue until the rumors began to take hold and other students started confronting him about Roe's claims, around Mid-December 2017.  Even still, he and Roe's interactions continued to be distant but cordial.  In Mid-December 2017, Roe attended a birthday celebration for Plaintiff's sister, again showing no signs of discomfort or fear of Plaintiff.

108.    In mid-February 2018, after Roe found out that Plaintiff was dating someone new, Roe confronted Plaintiff. Roe told Plaintiff that "upon talking with a friend, Roe "bec[a]me convinced" that Plaintiff had "sexually assaulted [Roe] multiple times." Roe then asked Plaintiff for an apology. Plaintiff listened to Roe's concerns but could not apologize for something he did not do. Plaintiff offered Roe a general apology for causing Roe any pain, thinking specifically of his having cheated on Roe and their general relationship troubles.

109.    After Plaintiff refused to admit to assaulting Roe, Roe's campaign against Plaintiff kicked into high gear. Roe sent out a group email to various members of their singing group, including Plaintiff's sister, stating that Roe did not want Plaintiff around because of Plaintiff's "sexually assaulting" Roe. In the email, Roe claimed Plaintiff assaulted Roe "multiple times," that he was "dangerous," and that the most "clear cut" was the last time Plaintiff and Roe slept together, when Plaintiff "pinned" Roe down and then asked "is this sexual assault?".

110.    Eventually, Roe made sure that the entirety of Roe and Plaintiff's mutual friends knew about Roe's allegations, and claimed that Roe was scared of Plaintiff because of Plaintiff's "anger" issues.[6]

111.    As part of Roe's smear campaign against Plaintiff, Roe sought to, and succeeded in, ensuring that Plaintiff was ousted from their mutual clubs. Indeed, Roe insisted that Plaintiff withdraw from their mutual activities, claiming that Roe was scared of Plaintiff and should not be prevented from continuing in these activities. Yet, after successfully removing Plaintiff from these activities, Roe then routinely missed club events and practices.

112.    In addition, when Roe was later confronted with the dubious nature of Roe's claims that plaintiff was "dangerous", Roe then tried to backtrack, asserting that Roe meant

---

[6] Plaintiff has never been in a physical altercation with anyone in his life. Except for Roe's claims, Plaintiff has never been reported or disciplined for violence of any kind.

Plaintiff was emotionally dangerous and that Roe's primary fear was for emotional, not physical, harm.

### C. **Princeton Prosecutes Plaintiff.**

113.    On or about March 13, 2018, Plaintiff was notified that the Dean had issued a no-contact order between Plaintiff and Roe.

114.    On or about March 19, 2018, Plaintiff received an email from Defendant Crotty stating: "Unfortunately, allegations have been made with my office that on or about Saturday, November 4, 2017, you allegedly engaged in non-consensual sexual contact with another student ([Roe]) in your dormitory room."  The letter did not contain any specific allegations.  The letter invited Plaintiff to schedule an interview with the Title IX Panel, which consisted of Defendants Crotty, Shueh, and Wright.

115.    In accordance with Princeton's policy, the Title IX Panel would be both the investigator and the adjudicator of Roe's claims against Plaintiff.  In addition, it is Princeton's ordinary and routine practice not to record witness interviews, instead drafting written summaries after the fact.  As such, there is no objective record of the witness statements, and no concrete way to know whether witnesses may have made exculpatory statements which were excluded from the "summary," resulting in a dangerous potential for abuse.

116.    On or about March 26, 2018, Roe met the Title IX Panel.  Roe told the Panel that Roe and Plaintiff had dated very briefly, their relationship ended in January 2017, and that they "hooked up a couple times" in the Fall of 2017.  Roe entirely skipped over the events of 2017, including, notably, that Plaintiff broke up with Roe on the day before the alleged assault.

117.    On information and belief, at the March 26 meeting, Roe's account of the alleged sexual assault was as follows:

a.  On the evening of November 3/Morning of November 4, 2017, Roe and Respondent were both at the *a capella* party in Roe's dorm.[7]  Roe did not drink alcohol.  Plaintiff arrived to the party drunk.

b.  As the get-together ended, Roe went to Plaintiff's room to retrieve a toothbrush Roe had left there from staying over the previous night.  Roe did not specify how Roe got into Plaintiff's room.[8]  According to Roe, once inside, Plaintiff asked Roe to stay the night.  Roe then put on Plaintiff's shirt and a pair of his boxers[9] and got into bed.

c.  Once in bed, Plaintiff kept trying to kiss Roe and touch Roe over Roe's clothes.  Plaintiff was "sloppy" drunk and Roe said "no" and "stop."  Plaintiff was on top of Roe.  Plaintiff then asked if what he was doing was "sexual assault."  Roe told Plaintiff "no."  Then Plaintiff got up and took a shower.

d.  After the shower, Plaintiff returned to bed.  Roe pretended to be asleep.  Plaintiff continued to try to hook up with Roe for "an hour" while Roe said no "in various ways."  At this time, Plaintiff touched Roe's breasts under Roe's shirt, but Roe could not recall whether Plaintiff touched Roe's genitals or buttocks under the clothing. Eventually the two went to sleep, and Roe woke up alone.

---

[7] Roe's dorm and Plaintiff's dorm were connected through the basement.  A student could travel from dorm to dorm that way without having to swipe in or out of each separate building using their Princeton University security pass, or proximity card reader ("prox card").

[8] The locking mechanism on Plaintiff's door could be disabled by placing a small magnet on the inside of the door (students refer to the practice as "taping" the door).  Plaintiff would regularly "tape" his door to use the kitchen or lounge or make other short trips so that he did not have to use his key to get back in.  On at least one occasion, Roe requested Plaintiff tape his door so that Roe could come in and retrieve things.

[9] Plaintiff did not own boxers.

e.   Towards the end of November, Roe told Student B that Respondent "never listened" when Roe said "no."  Student B then told Roe, "you realize that's sexual assault?" to which Roe responded that Roe did not know that.

f.   Asked why Roe waited until February to say something to Plaintiff, Roe said Roe wanted to give Plaintiff the "benefit of the doubt" and did not believe Plaintiff acted "purposefully."

g.   At this same interview, Roe provided the Panel with a picture of a purported diary entry about the evening in question.  The Panel questioned Roe about a statement in the entry indicating that during the night, Roe told Plaintiff to go masturbate. The Panel asked whether that was when Plaintiff went into the shower.  Roe then stated that Plaintiff came back from the shower first, then assaulted Roe, then went into the bathroom presumably to masturbate.

h.   Roe alleged there was a "pattern" of nonconsensual touching by Plaintiff, but that Roe didn't have "proof" of any other occasions and could not provide any examples or approximate dates.

118.   Notably, despite Roe's claim that Plaintiff was repeatedly assaulting Roe, Roe apparently chose to stay in Plaintiff's room and continue sleeping in his bed, rather than simply leaving and going back to Roe's own room during either of the two occasions when Plaintiff allegedly left the room for an extended period of time.  Roe was never questioned as to this decision.

119.   On or about March 27, 2018, Plaintiff met with Princeton's Title IX Panel. Plaintiff told the Panel all about his and Roe's complicated relationship, the two occasions when he broke up with Roe, and the last night they were together romantically—November 2, 2017.

32

Plaintiff also reported the occasion in the Summer of 2017 when he was incapacitated and woke up next to Roe.  Plaintiff told the Panel that Roe did not return to Plaintiff's room after the *a capella* party on the night of November 3, 2017.  Plaintiff stated that while he did drink on the night of the party, he was not blacked out and would have remembered if Roe slept over.  In other words, Roe's entire story was fabricated.

120.    In a subsequent interview with the Title IX Panel, Roe's story changed, much of which was in response to information provided by witnesses in the interim.  For example:

a. When confronted with the witness statements that Roe had told people the assault varied from digital penetration to "sex" and "rape", Roe stated that Roe could not recall specifically whether any penetration happened.  Roe stated that if Roe told witnesses that penetration happened, then that was more reliable, but that Roe believed there "may" have been digital penetration, not sex.

b. Despite initially stating that Roe went from the party to Plaintiff's room, Roe then stated, consistent with what witnesses had said, that Roe began walking with a few other people towards the library, and then turned back to retrieve the toothbrush. Even still, Roe gave conflicting information on the path Roe allegedly took to get to Plaintiff's room. Roe stated that Roe took a certain elevator to Plaintiff's room, but Roe's electronic security card records showed Roe using a different elevator, on the opposite end of the building.

c. Roe could not recall how Roe got into Plaintiff's room – including whether Roe knocked on the door or not.  Notably, Roe never specifically stated that Plaintiff let Roe into his room.

d. Roe also "remembered" that Roe was, in fact, drinking alcohol that night—which one of the other witnesses had already reported in the interim.

e. When confronted with each of the specific statements from witnesses stating that Roe told them all different things, Roe claimed they were inaccurate, that Roe never used the word "rape," that Roe never told anyone they had sex, and that the witnesses must have been confused or were just misquoting Roe. Indeed, when Roe would later submit a written response to the evidence file, much of it was dedicated to "correcting" or flat out denying the witness statements about Roe's varying allegations.

121. On or about April 13, 2018, Plaintiff met with the Panel for another interview. Plaintiff reiterated that Roe did not come to his room on the night of the alleged assault and did not stay the night. The Panel confronted Plaintiff with copies of Roe's proximity card reader ("prox card") records indicating Roe had entered Plaintiff's building at 3:14 a.m. on November 4, 2017, as well as a copy of Plaintiff's electronic door records, which indicated Plaintiff's door was left open for two minutes from 3:19 a.m. to 3:20 a.m.

122. At this point in time, it had been nearly six months since the night in question. Plaintiff surmised he may have propped his door to go to the kitchen, but truly could not recall. He reiterated that Roe did not come to his room, or, if Roe did, Plaintiff must have been in the bathroom at the time.

123. Plaintiff also told the Panel that he did not know why the prox card records showed Roe entering Plaintiff's building at 3:14 a.m., but noted that simply because the prox records reflected that Roe entered Plaintiff's building did not mean that Roe came to his room. Plaintiff noted that it was not unusual for Roe to sleep in places outside of Roe's room and that

Plaintiff's dormitory connects internally to five other dormitories, including Roe's own dormitory, and that accessing those other dormitories does not require the use of a prox card when traveling through the basement.  In addition, Roe could have been prox'd into any other location after leaving Plaintiff's dorm, by another student using their own card.[10]

124.   On or about April 27, 2018—approximately a month <u>after</u> Plaintiff was first interviewed by the Panel—Plaintiff received a letter from Defendant Crotty advising him that he was being charged with "Non-Consensual Sexual Penetration and/or NonConsensual Sexual Contact in that, while under the influence of alcohol, in the early morning of November 4, 2017, in your dormitory room, you allegedly non-consensually kissed [Roe], touched [Roe's] breasts (above and below [Roe's] shirt), touched [Roe's] buttocks (over [Roe's] clothing), touched [Roe's] genital area (above and below [Roe's] clothing), and digitally penetrated [Roe's] vagina."

125.   Enclosed with the Charge letter were, according to Crotty, "the documents that the panel has collected thus far that are pertinent to this case."  Notably, there was no initial Title IX complaint included with the documents.  Nor did the package include Roe's purported diary entries.  The package had <u>all witness names redacted</u>, leaving Plaintiff with no real opportunity to raise relevant concerns such as conflict or bias by the witnesses.  In addition, while there were witness interview summaries for Students A, B, C, D, E, F, G, H, and K, there was no mention of Students I and J, nor whether they made statements or what those statements may have contained.

---

[10] Indeed, after Roe graduated, Roe continued to come to campus, attend students-only events, and utilize campus buildings, including dining halls.  On information and belief, Roe also slept in the dorms.  Plainly, Roe was able to move through campus and the dormitories without using a prox card.

126.    On May 25, 2018—after Plaintiff had completed all of the coursework necessary for his degree, and just weeks before he was set to graduate—Defendants Crittenden and Deignan wrote to Plaintiff advising him that the Panel had concluded, using a preponderance of the evidence standard, that Plaintiff was responsible on the first charge of Non-Consensual Sexual Contact and not responsible on the second charge of Non-Consensual Sexual Penetration (the "Finding").  The Panel acknowledged that the finding of "not responsible" on the second charge was due to Roe's inconsistent statements and inability to recall whether penetration occurred.  Yet, despite openly acknowledging the unreliability of Roe's narrative, Plaintiff was found responsible for the first charge based almost exclusively on Roe's claims.

127.    Curiously, the Panel claimed Roe's credibility was bolstered by the alleged contemporaneous diary entries; however, the Panel did not include these entries in the packet of "relevant" materials supplied to Plaintiff.

128.    According to the letter, Crittenden and Deignan determined the Sanction. Princeton imposed a disciplinary sanction pursuant to which the University withheld Plaintiff's undergraduate degree, which he was scheduled to receive in June 2018, until January 2019, along with a concurrent transcript freeze and notation on his transcript.  As the letter explained, this is the functional equivalent of a suspension.

129.    The sanction letter gave several justifications for imposing so severe a sanction as withholding Plaintiff's degree. However, most of these "reasons" were simply the Panel's conclusions that Roe did not consent, including a basic copy/paste of part of the Policy definition of consent.

130.     As the element of non-consent is a requisite for the finding of responsibility, it is unduly punitive and inappropriate to consider the Panel's conclusion that Roe did not consent as essentially an aggravating factor for imposing such a harsh sanction.

131.     Moreover, the Sanction Letter indicates the Panel did not consider Plaintiff's clean disciplinary record, which at that point, spanned his entire four years at Princeton.  Instead, the Panel stated that a primary reason for the Sanction was that other students who were found responsible for Nonconsensual Sexual Contact were suspended in the past.  In other words, Princeton relied on the class of violation to the exclusion of any individual factors.

### D.  Plaintiff Appeals; Princeton Deflects.

132.     On or about June 8, 2018, Plaintiff appealed the Title IX Panel's findings (the "Appeal") to the Student Appeals Committee, consisting of Defendants Calhoun, Dolan, and Leslie, on the basis of procedural errors and new, relevant information, and appealed the Sanction.

133.     Plaintiff's Appeal noted that, among other things: (i) The Panel completely ignored the myriad inconsistencies in Roe's various statements, instead essentially concluding that because Roe had told so many people, *some* version of the story must have been true; (ii) the Panel interpreted the prox card and door records as supporting Roe's story and contradicting Plaintiff's, even though the timing of the records contradicted Roe's timeline and the records were equally consistent with Plaintiff's proffered explanations for the records; (iii) Students I and J were not accounted for in the investigative file or Panel report, meaning they may have provided exculpatory evidence that was withheld from Plaintiff; and (iv) the Panel never interviewed the people Plaintiff was with on the morning of November 4, 2017.

134.     This last point was critical because, as Roe told it, Plaintiff was "sloppy drunk" and awake until close to five in the morning, if not later.  It was undisputed that Plaintiff left for

his videographer work with the football team between 8:00 and 9:00am that morning.  Common sense would indicate that if the events occurred as Roe alleged, it would be relevant to interview the other people who saw Plaintiff the next morning, as Plaintiff might have told them he was up late, he was hungover, etc., or conversely, they could have testified that Plaintiff was lively, alert, and rested.

135.    On June 26, 2018, the Student Appeals Committee summarily denied the Appeal and upheld the Finding and Sanction ("the Appeal Denial").

136.    Other than a general statement that the Panel reviewed and considered all relevant information, the Appeal Denial did not provide any substantive reasoning for upholding the Finding.  Notably, the Appeal Denial entirely failed to address Plaintiff's concern over the missing witnesses, Student I and Student J.

137.    With regard to the Sanction, the Appeal Denial literally copy/pasted the explanation from the Sanction Letter as to how the Sanction was decided.  It did not address the blatant impropriety of the factors relied upon, nor the failure to consider Plaintiff's spotless disciplinary record.

138.    In November 2018, Plaintiff wrote to the Student Appeals Committee regarding some new evidence.  Specifically, Plaintiff provided a copy of a handwritten letter from Roe wherein Roe requested Plaintiff tape his door so that Roe could come in to retrieve some items.  Plaintiff also provided photographs of Plaintiff, Roe, and a few others at the 2017 Macy's Thanksgiving Day parade in New York City, a few weeks after the alleged incident, wherein Roe is clearly having a good time and not afraid of Plaintiff, as Roe later claimed.

139.    On or about December 11, 2018, the Student Appeals Committee rejected the newly identified information.

140.    Plaintiff has exhausted all available avenues for appeal under Princeton's policies. This lawsuit represents Plaintiff's only hope to redress the wrongs occasioned by Defendants.

## III. AGREEMENTS, REPRESENTATIONS, COVENANTS & WARRANTIES BETWEEN PLAINTIFF AND DEFENDANT PRINCETON UNIVERSITY.

141.    Upon Plaintiff's matriculation into Princeton, Plaintiff and Princeton became mutually bound by the Princeton University "Rules, Rights, Responsibilities" document (RRR), which contains Princeton's various policies on student conduct, discipline, and students' rights and responsibilities.   The RRR also contains Princeton's Sexual Discrimination and Sexual Misconduct Policy ("the Policy"), which is the applicable policy for Princeton's Title IX procedures.

142.    On information and belief, the RRR is updated and/or reissued each new school year.

143.    On information and belief, the RRR and/or the various policies contained therein, are available online on the Princeton University website.

144.    The RRR constitutes and represents a contract between students and the University and, in particular, between Plaintiff John Doe and Defendant Princeton University.

145.    Throughout the Title IX process in this case, Defendants breached their contractual obligations and the implied covenant of good faith and fair dealing by failing to abide by the Policy and the other processes outlined in the RRR, and by permitting gender bias to infect and taint the proceedings, resulting in an erroneous outcome and selective enforcement of the Policy.

146.    The Policy describes certain prohibited conduct, including different types of sex discrimination and sexual misconduct.  Moreover, the Policy advises that "[a]ll forms of sexual

misconduct are serious offenses and will result in University disciplinary consequences." (Section 1.3.3(2)).

147.    According to the Policy, Princeton "has an obligation to make reasonable efforts to investigate and address complaints or reports of sex or gender discrimination, including sexual misconduct, whenever it becomes aware of such a complaint or report."   (Section 1.3). Specifically, the Policy provides that "[i]n order to protect the safety of the campus community, the Title IX Coordinator may investigate allegations of violations of this policy even absent the filing of a formal complaint or report, or if a complaint or report has been withdrawn. The Title IX Coordinator may need to proceed with an investigation even if a complainant specifically requests that the matter not be pursued." (1.3.10.1)

a.    Princeton violated the Policy by failing to address Plaintiff's report that Roe had sex with him while he was incapacitated.  Notably, according to the Title IX 2017 Q&A, "[w]hether or not a student . . . asks the school to take action, where the school knows or reasonably should know of an incident of sexual misconduct, the school <u>must</u> take steps to understand what occurred and to respond appropriately." 2017 Q&A at 1 (emphasis added).

b.    Whether or not Plaintiff chose to pursue a formal complaint against Roe, Princeton violated the Policy by failing to institute an investigation into Roe's actions of sleeping with Plaintiff while he was incapacitated.  As a matter of fact, Plaintiff is in possession of an audio recording in which two witnesses from the evening in Summer of 2017 agree that Roe "took advantage" of Plaintiff; though the second witness, who is in the same social circle as Roe, then follows up with "but . . . I'd be burned at the stake for saying that."  This was a reference to the

40

pressure Roe placed on others (some of whom were interviewed by the Title IX Panel as "witnesses") to believe Roe and shun Plaintiff.

c. Princeton also failed to investigate Plaintiff's report of Roe kissing a drunk girl whom Roe knew to have not been generally interested in women, as evidenced by Roe's flippant comment that the drunk student "may have been questioning her sexuality" by making out with Roe.

d. Princeton also failed to sufficiently investigate concerns raised by Plaintiff's sister, in the Fall of 2018, that Roe had been stalking her. Despite having graduated by that time, Roe continued to regularly come to campus and, specifically, to attend student-only events and club meetings with Plaintiff's sister. Princeton's initial response was simply that alumni are welcome on campus and that Plaintiff's sister should file a formal complaint if she feels threatened.

e. Princeton's failure to investigate multiple instances of Roe engaging in sexual activity with drunk/incapacitated students, evidencing a possible pattern of abuse, as well as possible stalking/harassment, indicates Princeton's selective enforcement as between male respondents and similarly situated non-male respondents.

148. Pursuant to the Policy, "[t]he Title IX Coordinator will seek to complete the investigation and any resulting disciplinary process and provide notice of the outcome within 60 calendar days after receipt of the complaint or report, and that the University "will notify the parties in writing of any extension of the timeframes for good cause, and the reason for the extension." (Section 1.3.10).

a. Princeton violated the Policy because, on information and belief, the Title IX office received the complaint or report <u>at least</u> as early as March 13, 2018, when the No-Contact Order was issued. However, the Finding was not issued until May 25, 2018—over sixty days later—and the parties were never informed in writing of the extension.

b. Notably, the Panel's final report issued with the Finding carefully avoids setting forth the date the complaint was first received, and, in fact, Plaintiff was never provided a copy of the initial complaint or statement. This indicates that not only did Princeton violate the Policy, it did so deliberately and in bad faith, in order to prevent Plaintiff from discovering its malfeasance.

149. According to the Policy, "[a]ll panelists will have training in investigating and evaluating conduct prohibited under the policy. The panelists will also be impartial and unbiased." (Section 1.3.12.1).

a. Princeton violated the Policy because, on information and belief, the panelists were improperly and inadequately trained, and were partial and biased.

b. Defendant Crotty, as the Director of Title IX Administration at Princeton, had a vested interest in finding Plaintiff guilty as a male accused, in response to years of harsh criticism, student protests and town-hall style meetings, student government resolutions, and costly OCR investigations regarding Princeton's failure to adequately punish male respondents accused of sexual misconduct, and was therefore both partial and biased.

c. Moreover, because the Panelists served as both the investigators <u>and</u> the adjudicators, they were undoubtedly biased by certain irrelevant and inadmissible

42

evidence discovered during the investigatory phase. For example, one of the student witnesses made numerous negative character assessments about Plaintiff, which were informed by their former romantic history in which Plaintiff spurned the student. Obviously, such statements were inappropriate and biased, which is why they were excluded from the final report. However, the whole point of excluding such statements from the final report is to prevent the adjudicators from learning about and considering improper evidence. If the investigators and the adjudicators are one and the same, it is obvious that such statements have a dangerous and undeniable capacity to bias the panel in the adjudicative phase.

150.    The Policy states, "the panel will interview witnesses as necessary . . . . In all meetings, there will be a designated note taker. At the conclusion of each interview, the notes will be reviewed with the interviewee." (Section 1.3.12.1).

   a.   Princeton violated the Policy by failing to interview witnesses who could have shed light on Plaintiff's condition, behavior, and statements in the hours immediately following the alleged assault, despite Plaintiff's express requests for them to do so. Yet, the Panel was more than happy to interview multiple witnesses whose testimony consisted entirely of hearsay from Roe and who had no contemporaneous personal knowledge of relevant events.

   b.   The Panel also failed to interview any of Plaintiff's neighbors as to what they may have seen or heard on the night in question. Considering that Plaintiff denied Roe even came over, the neighbors could obviously have provided testimony as to whether they heard Roe come over, knock, speak with Plaintiff, or leave, or

whether they heard any arguing or heard or saw Plaintiff purportedly taking a shower at around 4:00am.

151. According to the Policy, "[t]he panel will prepare a case file of <u>all</u> interview summaries, witness statements, and other documents.  The file, redacted of personally identifiable information as necessary, will be shared with the complainant and the respondent." (Section 1.3.12.1) (emphasis added).

   a. Princeton violated the Policy because it failed to provide Plaintiff with: (i) Roe's initial statement/complaint; (ii) the statements of Students I and J (and potentially others); and (iii) Roe's diary entries.  Indeed, when Plaintiff raised the issue of missing witness statements in his Appeal, Princeton expressly failed to address that concern, neither confirming nor denying that critical information was withheld from Plaintiff.

   b. Moreover, the failure to provide Plaintiff with Roe's initial statement/complaint precluded Plaintiff from being able to address any inconsistencies between Roe's initial claim and Roe's later statements.  This was clearly important here, where Roe essentially never made two identical statements about the alleged assault.

152. According to the Policy, the Title IX Panel will "conduct an inquiry and determine, by a preponderance of the evidence" whether the Policy was violated.  (Section 1.3.12).

   a. Princeton violated the Policy because it failed to conduct a genuine inquiry, including failing to interview potentially exculpatory witnesses.

   b. Princeton violated the Policy because the Findings were plainly against the weight of evidence.

     c.   Roe told numerous versions of the alleged assault, and even sought to discredit Roe's own witnesses when it became clear that the accounts of the alleged assault were incompatible.  The Panel wrote off all of the blatant evidence undercutting Roe's credibility as simply witness error or "confusion," presuming Roe to be truthful and seeking to conform the evidence to that pre-conceived conclusion.

     d.   The Panel refused to investigate actual contemporaneous witnesses, such as Plaintiff's neighbors, and the people Plaintiff was with on November 4, 2017.

     e.   The Panel concluded that the prox card records supported Roe's claim, when they were equally compatible with Plaintiff's proffered explanations – meaning that Princeton declined to apply the presumption of innocence, as such a presumption requires equivocal evidence to be viewed in favor of the respondent.

     f.   All in all, the Panel relied on preconceived notions about complainants and male respondents, and, rather than evaluating the evidence, simply distorted the evidence to support the predetermined outcome and disregarded or discounted all evidence incompatible with that conclusion.

153.   According to the Policy, "[p]enalties will be determined based on the seriousness of the misconduct as compared to like cases in the past, and the student's previous disciplinary history (if any)."  (Section 1.3.12.2).

     a.   Princeton violated the Policy because Defendants Crittenden and Deignan entirely failed to take into account Plaintiff's history of a <u>full</u> four years at Princeton without <u>any</u> disciplinary issues.  Because Plaintiff had essentially completed his education by the time the Finding was issued, the Sanction of withholding the degree was the strongest sanction Princeton could impose, short of refusing to

confer the degree altogether.  Plainly, such a sanction did not take into account Plaintiff's four years of good behavior at Princeton.

    b.  Princeton violated the Policy because the severity of the alleged incident does not warrant a Sanction that, according to the University, is the equivalent of a suspension.  Notably, <u>Roe admitted that Roe did not even initially believe Roe and Plaintiff's alleged interaction was sexual assault</u>.  Nor was Roe actually scared of Plaintiff, as evidenced by Roe continuing to spend time with Plaintiff, even in small groups, in the weeks following the alleged assault.  It was not until <u>after</u> Plaintiff made clear that Plaintiff wanted nothing more to do with Roe that Roe began claiming Plaintiff was dangerous and Roe was scared.

    c.  Moreover, the Panel expressly found Plaintiff <u>not</u> responsible for any sort of penetration.  And, according to several of the witnesses relaying <u>Roe's own account of the event</u>, Roe initially said no, but then said "yes."  Thus, setting aside that Roe's entire claim was fabricated, even if it were true, it would be a situation of non-penetrative contact between students who had been sleeping together for approximately two years, in which Roe said yes despite initial hesitation.  Such a situation does not warrant a suspension.

154.  According to the Policy, all members of the Appeal Panel "will have training regarding Title IX and prohibited conduct defined under this policy" and "will be impartial and unbiased."

    a.  Princeton violated the Policy because, on information and belief, the Appeal Panel was insufficiently and inadequately trained, and the members were institutionally biased as a result of pressure from OCR, as well as the student

body, to impose the harshest penalty possible in response to finding any male student responsible for sexual misconduct.

## IV.  PLAINTIFF'S DAMAGES.

155.    As a direct and proximate result of Defendants' biased, illegal, negligent and improper conduct, an erroneous finding that Plaintiff engaged in Non-Consensual Sexual Contact has been made part of Plaintiff's educational records and a permanent notation has been made on his transcript that his degree was withheld.  These records may be released to educational institutions and employers to whom Plaintiff applies, substantially limiting his ability to gain acceptance to graduate school, or to secure future employment.

156.    Prior to Roe's claims, Plaintiff had never, in his life, been in trouble for any form of wrongdoing, let alone something as serious and abhorrent as sexual assault.  Plaintiff had never so much as been called to the principal's office, issued a detention, or been in a fight.  Yet Roe's allegations painted him as a dangerous sex criminal, wiping out a lifetime of being a positive, rule-abiding person.

157.    By improperly withholding Plaintiff's degree and placing a permanent notation on his college transcript, Princeton has damaged Plaintiff's future education and career prospects. Specifically, as a result of Princeton's actions, Plaintiff will be forced to disclose and explain to potential employers and any graduate school to which he may opt to apply that he was disciplined by Princeton for sexual misconduct.

158.    In the wake of the powerful #metoo movement, schools and employers will not be clamoring to hire or admit someone who has been found responsible for sexual assault.  And, even if Plaintiff's potential graduate school or employer sees the belated degree and does not ask

about it, they will likely presume that Plaintiff failed to meet all of the academic requirements for a timely graduation, again placing him at a severe disadvantage.

159.    Due to Defendants' biased, illegal, negligent and improper conduct, Plaintiff was subjected to an unfair, biased, improper investigation and adjudication process which destroyed his reputation and will permanently impact his future education and career prospects.

160.    Due to Defendants' biased, illegal, negligent and improper conduct, Plaintiff was treated as a perpetrator and presumed guilty from the start.

161.    Due to Defendants' biased, illegal, negligent and improper conduct, Plaintiff has been falsely labeled as a perpetrator of sexual misconduct.

162.    Due to Defendants' biased, illegal, negligent, and improper conduct, Plaintiff's academic file is now marred by a false and baseless finding of sexual misconduct, and the Sanction is listed on Plaintiff's transcript.

163.    Due to Defendants' biased, illegal, negligent and improper conduct, Plaintiff has suffered and will continue to suffer ridicule, reputational damage, economic loses, and damage to his future educational and career prospects.

### AS AND FOR A FIRST CAUSE OF ACTION
**Violation of Title IX of the Education Amendments of 1972**
**Erroneous Outcome**
**(Against Defendant Princeton University)**

164.    Plaintiff John Doe repeats and re-alleges each and every allegation above as if fully set forth herein.

165.    Title IX of the Education Amendments of 1972 provides, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

166.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant Princeton University.

167.    On information and belief, Princeton receives federal funding, including in the form of federal student loans given to students and subject to the provisions of Title IX. According to Princeton's Consolidated Financial Statements for the period ending June 30, 2018 and 2017, Princeton received more than $290 million in government grants and contracts. In addition, Princeton receives additional federal assistance in the form of tax breaks, student loans, and Pell grants.

168.    Title IX is enforceable through a private right of action.

169.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student…complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (2018); 28 C.F.R. § 54.135(b) (2018).

170.    The "prompt and equitable" procedures that a school must implement include, at a minimum: "[n]otice . . . of the procedure, including where complaints may be filed; [a]pplication of the procedure to complaints alleging harassment; . . . [a]dequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence; . . . [and] [d]esignated and reasonably prompt timeframes for the major stages of the complaint process."  Dep't of Ed., *Office for Civ. Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (Jan. 19, 2001), at 20.

171.    According to the 2001 Guidance, the procedures adopted by a school covered by Title IX must accord "due process to both parties involved." *Id.* at 22.

172.    According to the 2001 Guidance, schools are obligated under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes 'alleged sexual assaults.'" *Id.* at 21.

173.    To succeed on an erroneous outcome claim under Title IX, a plaintiff must demonstrate: (1) a flawed proceeding, which (2) led to an erroneous outcome; and (3) gender was a motivating factor behind the erroneous outcome.

174.    An erroneous outcome occurred in this case because Plaintiff was subjected to a blatantly flawed proceeding and erroneously found to be responsible for violating Princeton's sexual misconduct Policy, and gender was a motivating factor behind this erroneous outcome.

175.    The proceedings were flawed and caused an erroneous outcome because, by way of example and not limitation:

   a.   From the start, the investigation was slanted in favor of the complainant Roe. Roe's story was deemed credible from the beginning and given more weight in the final analysis and determination of what occurred that night.  In that regard, Defendants primarily relied on inconsistent, hearsay statements obtained from "witnesses" who simply repeated what Roe told them, as opposed to having direct and contemporaneous knowledge;

   b.   Defendants failed to conduct a thorough investigation: specifically, the Panel declined to interview Plaintiff's neighbors and the people Plaintiff was with in the hours immediately following the alleged assault, choosing instead to rely on

witnesses who had no personal knowledge and were simply repeating Roe's oft-changing rumors;

c.  Defendants concluded that the prox card records support Roe's story and contradicted Plaintiff's, even though the records were not necessarily consistent with Roe's claims and were equally compatible with Plaintiff's explanation;

d.  Defendants demanded that Plaintiff come up with a <u>provable</u> explanation for Roe's prox card records, plainly disregarding that Plaintiff should have been afforded the presumption of innocence, and was not required to explain Roe's whereabouts;

e.  Defendants wrote off/ignored all of the inconsistencies in Roe's claims, and failed to acknowledge the importance of the timing and events preceding Roe's claims—specifically, that after nearly <u>two years</u> of sleeping together, Roe made the <u>first ever</u> allegation of sexual misconduct in the weeks immediately after being dumped by Plaintiff;

   i.  Indeed, this is the precise situation that Department of Education higher-up Candice Jackson warned of in a 2017 interview with The New York Times: "we broke up, and six months later I found myself under a Title IX investigation because [complainant] just decided that our last sleeping together was not quite right." *See* Erica L. Green and Sheryl Gay Stolberg, *Campus Rape Policies Get a New Look as the Accused Get DeVos's Ear*, New York Times (July 12, 2017), *available at* https://www.nytimes.com/2017/07/12/us/politics/campus-rape-betsy-

devos-title-iv-education-trump-candice-jackson.html?smid=tw-

nytimes&smtyp=cur&_r=0.

f.  Defendants ignored the fact that numerous witnesses stated Roe did not initially
believe the alleged incident was sexual assault and only began to claim as such
after allegedly being convinced to do so by another student, who, on information
and belief, was biased as a result of their own experience as a victim of sexual
assault;

g.  On information and belief, Defendants failed to provide Plaintiff with all of the
evidence gathered in the investigative process, including the initial
complaint/report, Roe's diary entries, and information related to witnesses
Student I and Student J;

h.  Defendants failed to conduct a timely investigation and adjudication, failed to
provide Plaintiff written notice and "good cause" for the delay, and attempted to
obfuscate their failure by failing to state the start date of the investigation/date of
initial complaint in the final investigative report;

i.  Defendants did not provide Plaintiff with a copy of the initial complaint/statement
against him, depriving him of the opportunity to challenge (additional)
inconsistencies in Roe's claims over time;

j.  Defendants failed to evaluate video security footage from Plaintiff's dormitory;

k.  Defendants failed to make video security footage from Plaintiff's dormitory
available to him for review;

l.  Defendants disregarded photographs that were taken after the alleged sexual
misconduct showing that, contrary to the Roe's claim that Roe feared Plaintiff,

Roe still attended various activities with Plaintiff, registered for and attended classes with Plaintiff, and was in no apparent discomfort or unease being around him until _after_ Plaintiff refused to admit to sexually assaulting Roe;

m. Defendants disregarded evidence that Roe had asked Plaintiff in the past to tape his door so that Roe could retrieve items from his room; and

n. On information and belief, the individual defendants were insufficiently and inadequately trained with respect to Title IX, and were partial and biased.

176. Particular circumstances suggest that gender bias was a motivating factor behind the flawed proceedings, erroneous findings and the decision to impose unduly harsh discipline upon Plaintiff.  These circumstances include, by way of example and not limitation:

a. The pressure imposed by the 2014 OCR resolution, including the fear of loss of federal funds, as well as the fear of added financial liability such as reimbursing tuition for aggrieved students, as well as subsequent complaints and OCR investigations into Princeton's alleged failure to sufficiently prosecute and punish male students/faculty accused of sexual misconduct;

b. Internal pressure from the student body and/or the media after years of harshly criticizing Princeton for its alleged failure to sufficiently prosecute and punish male students/faculty accused of sexual misconduct, including widespread student outrage in 2017 and 2018.  As Princeton's own school paper put it, "[t]he University, with its $25.9 billion dollar endowment, well-connected alumni, and strongly-opinionated student body, would likely face severe public backlash, as it has in the past, if it rolled back its Title IX protections for students. With a faculty-student sex scandal in 2017 and two others in 2014, the University's

public image has the potential to be tainted more by lax Title IX enforcement . . . .” Jasman Singh, *Title IX Changes Are Going to Hurt Those that Need the Enforcement the Most*, The Daily Princetonian (Nov. 28, 2018)—notably, each of the scandals identified in the article involved male respondents;

c. The institutionalized bias against male respondents and in favor of female complainants, as evidenced by, among other things, the campus survey results indicating sexual misconduct complaints against female respondents are not prosecuted as often or as harshly as complaints against male respondents.

d. The institutionalized bias embracing gender stereotypes, such as female victims and male assailants, as evidenced by Princeton's offering certain sexual assault self-defense courses exclusively to female students;

e. Defendants' refusal to initiate an investigation into Roe's potential pattern of engaging in sexual activity with drunk/incapacitated students, and specifically, the failure to conduct an investigation into the Summer 2017 evening when Plaintiff went to bed while incapacitated and woke up next to Roe;

f. Defendants' refusal to conduct any genuine investigation that could reveal exculpatory evidence, for example, failing to interview Plaintiff's neighbors and the people Plaintiff was with on the morning of November 4, 2017, as well as failing to review security footage of Plaintiff's dorm;

g. Defendants' distortion of the evidence to fit Roe's nebulous narrative, rather than impartially evaluating the facts of the case, including Defendants' presumption that the prox card records, which equally supported Plaintiff's explanation, somehow supported Roe and not Plaintiff;

h.  Defendants' withholding of potentially exculpatory evidence, specifically, the facts and circumstances surrounding undisclosed witnesses Student I and Student J;

i.  Defendants' failure to afford Plaintiff the presumption of innocence, as such would require Defendants to view equivocal evidence in favor of Plaintiff, which they did not do;

j.  Defendants' failure to properly apply the preponderance of the evidence standard; and

k.  Defendants' refusal to apply the particular facts of the case in considering the appropriate Sanction, including Plaintiff's complete lack of disciplinary history during his entire tenure at Princeton.

177.   On information and belief, Princeton's mishandling of the Complaint was informed by internal institutional pressure, ongoing OCR investigations, Princeton's 2014 settlement with the OCR, and the threat of rescission of federal funds.

178.   On information and belief, Princeton has engaged in a pattern of unfair investigations and adjudications resulting in serious sanctions being imposed on male students, while not making comparable efforts with respect to allegations of sexual violence and abusive conduct made against non-male students.

179.   Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and explicitly unfair process in violation of Title IX.

180.   This unlawful discrimination in violation of Title IX caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to, loss of future educational and

career opportunities, reputational damages, economic injuries and other direct and consequential damages.

181.    As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Princeton to: (i) reverse the outcome and findings regarding Alex Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the original Finding and Sanction from Plaintiff's educational file(s); (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; (v) issue Plaintiff a corrected degree with a conferral date of June 2018; and (vi) update all relevant records to reflect a degree conferral date of June 2018.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.**
**Selective Enforcement**
**(Against Defendant Princeton University)**

182.    Plaintiff John Doe repeats and realleges each and every allegation above as if fully set forth herein.

183.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

184.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant Princeton.

185.    On information and belief, Princeton receives federal funding, including in the form of federal student loans given to students and subject to the provisions of Title IX. According to Princeton's Consolidated Financial Statements for the period ending June 30, 2018

and 2017, Princeton received more than \$290 million in government grants and contracts. In addition, Princeton receives additional federal assistance in the form of tax breaks, student loans, and Pell grants.

186.   Title IX is enforceable through a private right of action.

187.   Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student…complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (2018); 28 C.F.R. § 54.135(b) (2018) (emphasis added).

188.   The "prompt and equitable" procedures that a school must implement include, at a minimum: "Notice . . . of the procedure, including where complaints may be filed; Application of the procedure to complaints alleging harassment . . .; Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence; Designated and reasonably prompt timeframes for the major stages of the complaint process; Notice to the parties of the outcome of the complaint; and [a]n assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects . . . ." Dep't of Ed., Office for Civ. Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (Jan. 19, 2001), at 20.

189.   According to the 2001 Guidance, schools are obligated under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes 'alleged sexual assaults.'" *Id.* at 21.

190.    To succeed on a selective enforcement claim, a plaintiff must demonstrate that gender was a motivating factor in the decision to initiate a disciplinary action and/or the severity of the punishment.

191.    Selective enforcement occurred in this case because Plaintiff's gender was a motivating factor in both Princeton's decision to initiate proceedings and in the implementation of the unduly harsh sanction of withholding Plaintiff's degree, which is a functional suspension.

192.    Princeton selectively enforced its Policy as between similarly situated male and non-male students. By way of example and not limitation:

    a.  Plaintiff and Roe were similarly situated in that both students alleged actions by the other that could constitute Nonconsensual Sexual Contact if substantiated, but Princeton prosecuted Roe's claims to the fullest, whereas Princeton ignored and discouraged Plaintiff's claims.    Specifically, Princeton knowingly and intentionally declined to pursue an investigation into the evening in Summer of 2017 when Plaintiff went to bed while incapacitated and woke up next to Roe, as well as an alleged incident wherein Roe engaged in sexual activity with an intoxicated female student whom Roe knew to have been drunk and not generally interested in women;

    b.  Princeton's own Policy, as well as the 2017 Q&A, direct that Princeton is obligated to investigate all potential incidents of sexual misconduct, regardless of whether the reporting student wishes to pursue a formal complaint, yet Princeton failed to do so when it came to Plaintiff's claims against Roe;

    c.  Princeton also insufficiently responded to reports that Roe was harassing and stalking Plaintiff's sister, also a Princeton student, again indicating Princeton's

general pattern and practice of not prosecuting claims against non-male students; and

    d. Roe was presumed credible from the start and Plaintiff was presumed guilty from the start.

193.    Princeton also imposed an unduly harsh sanction, which was motivated by Plaintiff's gender.  As Princeton acknowledged, given that Plaintiff had completed all of his degree requirements and was set to graduate mere weeks after the Finding was issued, the Sanction of withholding Plaintiff's degree was the harshest sanction available, short of refusing to confer the degree altogether.  Defendants' explanation for imposing the Sanction was based largely upon: (i) the Panel's finding that Roe did not consent, which is simply an element of the violation; and (ii) Princeton's claim that "similar" cases in the past had resulted in a suspension.

    a. Defendants failed to account for Plaintiff's spotless disciplinary record for his entire four years at Princeton, despite listing such a factor as relevant to the Sanction decision in the Policy; and

    b. On information and belief, non-male students accused of sexual misconduct were found responsible for lesser violations, and given lesser sanctions than male students accused of sexual misconduct, as evidenced by campus survey responses.

194.    Particular circumstances suggest that gender bias was a motivating factor behind Princeton's selective enforcement of the Policy. These circumstances include, by way of example and not limitation:

    a. The pressure imposed by the 2014 OCR resolution, including the fear of loss of federal funds, as well as the fear of added financial liability such as reimbursing tuition for aggrieved students, as well as subsequent complaints and OCR

investigations into Princeton's alleged failure to sufficiently prosecute and punish male students/faculty accused of sexual misconduct;

b. Internal pressure from the student body and/or the media after years of harshly criticizing Princeton for its alleged failure to sufficiently prosecute and punish male students/faculty accused of sexual misconduct, including widespread student outrage in 2017 and 2018. As Princeton's own school paper put it, "[t]he University, with its $25.9 billion dollar endowment, well-connected alumni, and strongly-opinionated student body, would likely face severe public backlash, as it has in the past, if it rolled back its Title IX protections for students. With a faculty-student sex scandal in 2017 and two others in 2014, the University's public image has the potential to be tainted more by lax Title IX enforcement . . . ." Jasman Singh, *Title IX Changes Are Going to Hurt Those that Need the Enforcement the Most*, The Daily Princetonian (Nov. 28, 2018)—notably, each of the scandals identified in the article involved male respondents;

c. The institutionalized bias against male respondents and in favor of female complainants, as evidenced by, among other things, the campus survey results indicating sexual misconduct complaints against female respondents are not prosecuted as often or as harshly as complaints against male respondents.

d. The institutionalized bias embracing gender stereotypes, such as female victims and male assailants, as evidenced by Princeton's offering certain sexual assault self-defense courses exclusively to female students;

e. Defendants' refusal to initiate an investigation into Roe's potential pattern of engaging in sexual activity with drunk/incapacitated students, and specifically, the

60

failure to conduct an investigation into the Summer 2017 evening when Plaintiff went to bed while incapacitated and woke up next to Roe;

f.   Defendants' refusal to conduct any genuine investigation that could reveal exculpatory evidence, for example, failing to interview Plaintiff's neighbors and the people Plaintiff was with on the morning of November 4, 2017, as well as failing to review security footage of Plaintiff's dorm;

g.   Defendants' distortion of the evidence to fit Roe's nebulous narrative, rather than impartially evaluating the facts of the case, including Defendants' presumption that the prox card records, which equally supported Plaintiff's explanation, somehow supported Roe and not Plaintiff;

h.   Defendants' withholding of potentially exculpatory evidence, specifically, the facts and circumstances surrounding undisclosed witnesses Student I and Student J;

i.   Defendants' failure to afford Plaintiff the presumption of innocence, as such would require Defendants to view equivocal evidence in favor of Plaintiff, which they did not do;

j.   Defendants' failure to properly apply the preponderance of the evidence standard; and

k.   Defendants' refusal to apply the particular facts of the case in considering the appropriate Sanction, including Plaintiff's complete lack of disciplinary history during his entire tenure at Princeton.

195.   On information and belief, Princeton has engaged in a pattern of unfair investigations and adjudications resulting in serious sanctions being imposed on male students,

while not making comparable efforts with respect to allegations of sexual violence and abusive conduct made against female/non-male students.

196.    Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and explicitly unfair process in violation of Title IX.

197.    This unlawful discrimination in violation of Title IX caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

198.    As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Princeton to: (i) reverse the outcome and findings regarding Alex Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the original Finding and Sanction from Plaintiff's educational file(s); (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; (v) issue Plaintiff a corrected degree with a conferral date of June 2018; and (vi) update all relevant records to reflect a degree conferral date of June 2018.

**AS AND FOR A THIRD CAUSE OF ACTION**
**Common Law Due Process: Fundamental Fairness in School Disciplinary Proceedings**
**(Against Defendant Princeton University)**

199.    Plaintiff John Doe repeats and realleges each and every allegation above as if fully set forth herein.

200.    New Jersey courts recognize that private school students facing disciplinary actions, up to and including expulsion, are entitled to a disciplinary process that: (i) adheres to

the school's established standards, and (ii) is "fundamentally fair," and that any findings must be based on sufficient evidence. *See Hernandez v. Don Bosco Preparatory High*, 322 N.J. Super. 1, 21 (App. Div.), *certif. denied*, 162 N.J. 196 (1999).

201.   In the instant case, Princeton's disciplinary process neither conformed to its established procedures nor satisfied principles of fundamental fairness.

202.   As described in Section III, supra, Princeton violated numerous substantive and procedural provisions of the Policy in investigating and adjudicating Roe's claims against Plaintiff, as well as failing to investigate or adjudicate Plaintiff's claims against Roe.

203.   Moreover, Defendants' overwhelming failure to conduct a thorough and impartial investigation—including the failure to interview witnesses who may have been to provide actual, first-hand, contemporaneous knowledge—instead, relying on hearsay witnesses who simply repeated Roe's (widely varying) claims, resulted in a process that was fundamentally unfair.

204.   Likewise, Defendants' failure to disclose to Plaintiff: (i) the start date of the Title IX process; (ii) Roe's initial complaint/statement; (iii) Roe's diary entries, upon which the Panel relied in making credibility assessments, and (iv) the identity of, and investigative actions related to, Student I and Student J, resulting in a proceeding that was fundamentally unfair, in that it deprived Plaintiff a meaningful opportunity to defend himself.

205.   Likewise, Defendants' failure to take into account Plaintiff's clean disciplinary record, when such consideration is explicitly listed in the Policy as relevant to such a determination, was fundamentally unfair in that it resulted in the imposition of an unduly harsh and unwarranted sanction.

206.   In addition, as described above, the Finding did not accord with the appropriate burden of proof, and was not based upon sufficient evidence in the record.

207.   Defendants' deficient "investigation", coupled with, among other things, their violation of numerous provisions of the Policy, resulted in a disciplinary process that was fundamentally unfair and wrongfully deprived Plaintiff of the timely conferral of his degree, to which he was entitled as a student who paid tuition to Princeton and timely completed all degree requirements necessary for the awarding of his undergraduate degree in June 2018.

208.   Plaintiff has an undeniably strong interest in his disciplinary and educational files, and the timely conferral of his undergraduate degree.

209.   Defendants' fundamentally unfair, unsupported, and inappropriate actions caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

210.   As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Princeton to: (i) reverse the outcome and findings regarding Alex Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the original Finding and Sanction from Plaintiff's educational file(s); (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; (v) issue Plaintiff a corrected degree with a conferral date of June 2018; and (vi) update all relevant records to reflect a degree conferral date of June 2018.

### AS AND FOR A FOURTH CAUSE OF ACTION
**Breach of Contract**
**(Against Defendant Princeton University)**

211.   Plaintiff John Doe repeats and re-alleges each and every allegation above as if fully set forth herein.

212.   At all times relevant hereto, a contractual relationship existed between Plaintiff and Princeton through Princeton's dissemination of the RRR and policies and procedures governing the student disciplinary system, including but not limited to the Policy, and Plaintiff's tuition payments and other consideration, such as compliance with the RRR and relevant policies.

213.   Princeton committed numerous breaches of its agreements with Plaintiff during the investigation and adjudication of Alex Roe's allegations against him, including but not limited to:

a.   Failing to provide a timely, fair, impartial, and equitable investigation and adjudication process;

b.   Failing to enforce the Policy against Roe;

c.   Failing to "make reasonable efforts to investigate and address complaints or reports of sex or gender discrimination, including sexual misconduct, whenever it becomes aware of such a complaint or report;"

d.   Failing to complete the investigation within 60 days, and failing to provide written notice outlining good cause for such delay;

e.   Failing to provide a properly trained, unbiased Panel and Appeals Board;

f.   Failing to interview relevant witnesses and review relevant evidence;

g.   Failing to provide Plaintiff with all of Roe's statements and access to the evidence collected throughout the investigation;

h.   Failing to provide Plaintiff with the diary entries upon which the Panel relied in crediting Roe's claims;

     i.    Failing to apply a presumption of innocence, and failure to properly apply the burden of proof; and

     j.    Failing to properly apply the factors for consideration in imposing an unduly harsh, unwarranted, unreasonable sanction.

214.    As a result of the direct, proximate, and foreseeable consequence of the foregoing breaches, Plaintiff sustained tremendous damages including loss of educational and career opportunities, reputational damage, economic injuries and other direct and consequential damages.

215.    Thus, Plaintiff is entitled to damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**Breach of Implied Contract/Quasi Contract**
**(Against Defendant Princeton University)**

216.     Plaintiff John Doe repeats and re-alleges each and every allegation above as if fully set forth herein.

217.    Plaintiff paid Princeton sums of money for his education, and in return, Princeton was to provide Plaintiff with access to its undergraduate degree program and the issuance of his degree upon the completion of his studies.

218.    Plaintiff's enrollment in, and attendance of, classes at Princeton created in Plaintiff an expectation that he would be allowed to continue his course of study until he earned his degree from Princeton, provided that he maintained satisfactory grades and complied with Princeton's rules and polices.

219.    Accordingly, an implied or quasi-contractual relationship existed between Plaintiff and Princeton under which each party owes the other certain duties.

220.    Under the implied/quasi-contract between Plaintiff and Princeton, Princeton had a duty not to suspend, expel, withhold a degree, or otherwise discipline Plaintiff for disciplinary misconduct arbitrarily, capriciously, maliciously, discriminatorily, or otherwise in bad faith or in violation of its posted policies and procedures.

221.    Princeton breached these contractual obligations by withholding Plaintiff's degree until January 2019 for sexual misconduct based on an investigative and adjudicative process that—in the ways, and for the reasons, set out above—was arbitrary, capricious, malicious, discriminatory, conducted in bad faith and failed to accord with the Policy.

222.    As a result of the direct, proximate, and foreseeable consequence of the foregoing breaches, Plaintiff sustained tremendous damages including loss of educational and career opportunities, reputational damage, economic injuries and other direct and consequential damages.

223.    Thus, Plaintiff is entitled to damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements.


### AS AND FOR A SIXTH CAUSE OF ACTION
**Breach of Implied Covenant of Good Faith and Fair Dealing**
**(Against Defendant Princeton University)**

224.    Plaintiff John Doe repeats and re-alleges each and every allegation above as if fully set forth herein.

225.    At all relevant times herein, a contractual relationship existed between Plaintiff and Princeton, the terms of which were dictated, in part, by Princeton's RRR and the policies and procedures contained therein, including but not limited to the Policy.

67

226.    Through the documents it publishes and provides to students, Princeton makes express and implied contractual commitments to students in exchange for their enrollment and payment of relevant tuition and fees.

227.    Included in these contractual agreements is the covenant of good faith and fair dealing implied in all contracts.  *See Palisades Properties, Inc. v. Brunetti*, 44 N.J. 117, 130 (1965).

228.    A party may be held liable for breach of the covenant of good faith and fair dealing even when there is no substantive breach of an express contractual term.  *See Hills v. Bank of Am.*, CIV.A. 13-4960 ES, 2015 WL 1205007, at *4 (D.N.J. Mar. 17, 2015) (citing *Wilson v. Amerada Hess Corp.*, 168 N.J. at 236, 236 (2001)); *Seidenberg v. Summit Bank*, 348 N.J. Super. 243, 257 (App. Div. 2002)).

229.    Princeton breached the covenant of good faith and fair dealing implied in all contracts.  Examples of such breaches include, but are not limited to:

    a.  Defendants' failure/refusal to conduct a thorough, impartial investigation, particularly the failure to even attempt to interview witnesses with relevant, contemporaneous, first-hand knowledge;

    b.  The failure to disclose pertinent information to Plaintiff, including Defendants' intentional obfuscation of the start date of the Title IX case, as well as Defendants' refusal to disclose the initial complaint/statement, as well as the identity/information related to witnesses Student I and Student J and Roe's diary entries;

    c.   Defendants' gender-based, selective enforcement of the policy in their aggressive pursuit of Roe's claims against Plaintiff, while entirely failing to enforce the Policy against Roe;

    d.   The use of a Title IX Panel that conducts both the investigation and the adjudication, resulting in the unavoidable tainting of the adjudication process by virtue of the Panel's knowledge of irrelevant and prejudicial information uncovered through the investigation;

    e.   Defendants' failure to apply the proper considerations in meting out the Sanction;

    f.   Defendants' pro forma and summary denial of Plaintiff's appeal without providing true analysis and rationale, and particular, without even addressing Plaintiff's argument about potentially withheld evidence; and

    g.   Defendants' failure to address a possible error by substantively reviewing new, relevant evidence submitted by Plaintiff subsequent to his Appeal.

230.    As a result of the direct, proximate, and foreseeable consequence of the foregoing breaches, Plaintiff sustained tremendous damages including loss of educational and career opportunities, reputational damage, economic injuries and other direct and consequential damages.

231.    Thus, Plaintiff is entitled to damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Negligence
**(Against Defendants Princeton University, Minter, Crotty, Shueh, Wright, Crittenden, Deignan, Calhoun, Dolan, and Leslie)**

232.    Plaintiff John Doe repeats and re-alleges each and every allegation above as if

fully set forth herein.

233.    To state a negligence claim under New Jersey law, a plaintiff must show that the defendant owed the plaintiff a duty; that the defendant breached such a duty; and that the breach was the proximate cause of the injury.

234.    Here, the Defendants formed a university-student relationship with Plaintiff and, in light of their participation in the Title IX process and the express provisions of the Policy, had a duty to him to conduct the disciplinary process with due care, to perform an investigation free from bias or conflict and to have proper training in investigating and evaluating the alleged conduct under Princeton's policies.

235.    In light of the Defendants' positions with Princeton, they had certain obligations with respect to the investigation and adjudication of Title IX complaints, including obligations owed to students, including Plaintiff, as to how they would treat students subject to a disciplinary procedure.

236.    The foregoing duties were breached when Plaintiff did not receive the full protection of the disciplinary process, and was subjected to a biased and prejudiced procedure, as described fully above.

237.    In light of Defendants' deliberate, bad-faith failure to conduct a genuine investigation, to apply the Policy equally to Plaintiff and Roe, to provide Plaintiff with relevant materials and potentially exculpatory evidence, and to impose an appropriate Sanction with due regard for Plaintiff's otherwise-spotless record, Defendants' behavior was grossly negligent.

238.    Defendants' actions display a rush to punish Plaintiff before he graduated, rather than a genuine, unbiased search for the truth, constituting gross negligence in light of the severe and lasting harm resulting from their actions.

239.    As a result of Defendants' breach of their duties, Plaintiff suffered immeasurable harm in the form of delayed educational opportunities, lost or postponed career opportunities and wages, and reputational harm.

240.    As a direct and proximate result of the above conduct, Plaintiff sustained damages, including, without limitation, loss of educational and career opportunities, reputational harm, economic injuries and other direct and consequential damages.

241.    Thus, Plaintiff is entitled to damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### Respondeat Superior
### (Against Defendant Princeton)

242.    Plaintiff John Doe repeats and realleges each and every allegation above as if set forth fully herein.

243.    As the employer for Defendants Minter, Crotty, Shueh, Wright, Crittenden, Deignan, Calhoun, Dolan, and Leslie, Princeton is vicariously responsible for the negligent acts of its employees committed during the course of their employment.

244.    As detailed above, the enforcement and fair and impartial investigation and adjudication of student disciplinary matters are part of the regular employment duties of Defendants Minter, Crotty, Shueh, Wright, Crittenden, Deignan, Calhoun, Dolan, and Leslie.

245.    As detailed above, Defendants Minter, Crotty, Shueh, Wright, Crittenden, Deignan, Calhoun, Dolan, and Leslie breached their duty of care to Plaintiff in the course of their employment and ordinary duties at Princeton, specifically, with regard to their actions and

inactions in selectively enforcing the Policy and subjecting Plaintiff to a biased, partial, defective, deficient, arbitrary and fundamentally unfair disciplinary process.

246.    As detailed above, the foreseeable, direct and proximate result of Defendants Minter, Crotty, Shueh, Wright, Crittenden, Deignan, Calhoun, Dolan, and Leslie's intentional, reckless, grossly negligent and/or negligent behavior was that Plaintiff sustained substantial injury, including, without limitation, loss of educational and career opportunities, reputational harm, economic injuries and other direct and consequential damages.

247.    As a result, Defendant Princeton University is liable to Plaintiff for the intentional, reckless, grossly negligent and/or negligent acts and omissions of Defendants Minter, Crotty, Shueh, Wright, Crittenden, Deignan, Calhoun, Dolan, and Leslie under the principle of respondeat superior.

248.    Thus, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

(i)     On the first cause of action for Violation of Title IX of the Education Amendments of 1972-erroneous outcome, a judgment against Princeton awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Princeton to: (i) reverse the outcome and findings regarding Alex Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the original Finding and Sanction from Plaintiff's educational file(s); (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; (v) issue Plaintiff a corrected degree with a conferral date of June 2018; and (vi) update all relevant records to reflect a degree conferral date of June 2018;

(ii)   On the second cause of action for Violation of Title IX of the Education Amendments of 1972-selective enforcement, a judgment against Princeton awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Princeton to: (i) reverse the outcome and findings regarding Alex Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the original Finding and Sanction from Plaintiff's educational file(s); (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; (v) issue Plaintiff a corrected degree with a conferral date of June 2018; and (vi) update all relevant records to reflect a degree conferral date of June 2018;

(iii)  On the third cause of action for Common-law Due Process/Fundamental Fairness, a judgment against Princeton awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Princeton to: (i) reverse the outcome and findings regarding Alex Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the original Finding and Sanction from Plaintiff's educational file(s); (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; (v) issue Plaintiff a corrected degree with a conferral date of June 2018; and (vi) update all relevant records to reflect a degree conferral date of June 2018;

(iv)   On the fourth cause of action for Breach of Contract, a judgment against Princeton awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)    On the fifth cause of action for Breach of Implied/Quasi-Contract, a judgment against Princeton awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)   On the sixth cause of action for Breach of the Covenant of Good Faith and Fair Dealing, a judgment against Princeton awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vii)  On the seventh cause of action for Negligence, a judgment against Defendants Princeton University, Minter, Crotty, Shueh, Wright, Crittenden, Deignan, Calhoun, Dolan, and Leslie, jointly and severally, in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(viii) On the eighth count for Respondeat Superior, a judgment against Princeton awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ix)     Equitable relief in the form of an order directing Defendants to: (i) reverse the outcome and findings regarding Alex Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the original Finding and Sanction from Plaintiff's educational file(s); (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; (v) issue Plaintiff a corrected degree with a conferral date of June 2018; and (vi) update all relevant records to reflect a degree conferral date of June 2018; and

(x)      Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

**Dated: March 5, 2019**

**NESENOFF & MILTENBERG, LLP**

By: */s/ Diana Warshow*
     Diana R. Warshow, Esq. (DZ-8280)
     Jeffrey S. Berkowitz, Esq. (JB-4753)
     Andrew T. Miltenberg, Esq.
     (*pro hac vice admission pending*)
     Adrienne Levy, Esq.
     (*District of NJ admission pending*)
     363 Seventh Avenue, Fifth Floor
     New York, New York 10001
     T. (212) 736-4500
     dwarshow@nmllplaw.com
     amiltenberg@nmllplaw.com
     jberkowitz@nmllplaw.com
     alevy@nmllplaw.com