# ATTACHMENT 2

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review


**PRINCETON UNIVERSITY**

**Office of the Provost**
Three Nassau Hall
Princeton, NJ 08544

## MEMORANDUM

**To:** Kathleen Deignan, Dean of Undergraduate Students
Cole Crittenden, Associate Dean of the Graduate School

**Cc:** Michele Minter, Title IX Coordinator, Vice Provost for Institutional Equity and Diversity

**From:** Regan Crotty, Director of Title IX Administration
Joyce Chen Shueh, Senior Associate Dean of Undergraduate Students
Walter Wright, Title IX Investigator

**Re:** Respondent '18

**Date:** May 17, 2018

---

### I. Summary of the Case

In her capacity as the University's Title IX Coordinator, Vice Provost Minter asked us to investigate and adjudicate allegations under Section 1.3 (Sex Discrimination and Sexual Misconduct) of *Rights, Rules, Responsibilities* related to Respondent '18.

Respondent was charged with Non-Consensual Sexual Contact and/or Non-Consensual Sexual Penetration in that, while under the influence of alcohol, in the early morning of November 4, 2017, in his dormitory room, he allegedly non-consensually kissed Complainant '18,[1] touched their breasts (above and below their shirt), touched their buttocks (over their clothing), touched their genital area (above and below their clothing), and digitally penetrated their vagina.

Based on the information before us, and using the preponderance of the evidence standard, the panel found sufficient information to substantiate the charge of Non-Consensual Sexual Contact. The panel therefore unanimously found Respondent *responsible* for Non-Consensual Sexual Contact.

Based on the information before us, and using the preponderance of the evidence standard, the panel unanimously found insufficient information to substantiate the charge of Non-Consensual Sexual Penetration. The panel therefore unanimously found Respondent *not responsible* for Non-Consensual Sexual Penetration.

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

## II. Procedural Overview

On March 26, 2018, the panel met with Complainant; they were accompanied by their adviser, ███████████████████████████████. On March 27, 2018, the panel met with Respondent; he chose not to be accompanied by an adviser. The panel met for a second time with each of the parties (on April 13, 2018 with Respondent, and on April 19, 2018 with Complainant and their adviser).

On April 27, 2018, the parties received charge letters and redacted case files containing the information that the panel had collected. The parties were given the opportunity to submit a written response to the panel, inform the panel that they would like to meet again with the panel, request that the panel consider the collection of other information, and/or identify individuals who may possess relevant information and request that such individuals be interviewed. Both parties submitted additional written materials, and Respondent requested a third meeting with the panel. A second case file was provided to the parties on May 17, 2018.

The following eight individuals were interviewed: Student B ██, Student D ██, Student A ██, Student H ██, Student G ██, Student C ██, Student K ██, and Student E ██.

The panel also reviewed all of the evidence provided by the parties and witnesses in connection with the investigation. The panel noted that the parties discussed this matter with a number of individuals at various times; the panel reviewed and considered all of those accounts, but only included in this memorandum certain relevant information related to the information provided by those individuals.

## III. Deliberations and Decision

### a. Review of Facts

At the outset, the panel noted that it was difficult to reconcile the parties' accounts, as Respondent denied that he and Complainant engaged in any sexual activity on the night in question or that Complainant was in his room at all that night.

Complainant and Respondent were previously in a romantic relationship, and they continued to engage in sexual activity on a semi-regular basis.[2] Both parties agreed that they engaged in sexual activity on the night prior to the incident in question.

Both parties agreed that on November 3, 2017, they were at an ████████ party in a lounge area in ████████████████████████. Complainant initially said they were uncertain whether they (Complainant) drank alcohol that night, but later recalled that they (Complainant) drank Strawberritas and Mangoritas. Respondent said that Complainant was drinking, but he was not

---

[2] Complainant told the panel that there was a "pattern of" non-consensual touching by Respondent. However, the November 3, 2017 incident was the most "clear cut," and they did not have enough details or "proof" of the other incidents to pursue a Title IX investigation regarding those.

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

sure how much;[3] Student H said that Complainant was drinking alcohol but was not intoxicated; and Student K said that Complainant was not drinking. Respondent said that he had a "few drinks" and was "probably a four" in terms of intoxication (with zero being sober and ten being passed out due to intoxication); Respondent said that he "wasn't that intoxicated," his alcohol consumption "didn't impair his memory" and he "remembered everything clearly." Complainant said that they could not estimate Respondent's level of intoxication; Student H recalled that Respondent was drinking alcohol but was not "drunk"; and Student K could not recall whether Respondent was intoxicated.

Complainant's Account of November 4, 2017 Incident

In summary, Complainant said that after the ▮▮▮▮▮▮ party, they (Complainant) went to Respondent's room to retrieve their toothbrush and stayed there overnight, during which time non-consensual sexual activity occurred.

According to Complainant, after the party, around 3:10 am, they were going to Lewis Library with Student G and Student H but turned around to go to Respondent's room (a single) to retrieve their toothbrush (which they had left there the prior night).[4] A 3:11 am text message from Complainant to Respondent read: "dude you have my toothbrush." Both Student G and Student H confirmed that on the way to the library, Complainant told them that Complainant needed to retrieve their toothbrush from Respondent's room, and the last they saw Complainant was Complainant walking on the path toward Respondent's room (Student H said this route would have also led to Complainant's room, but would have been a longer route for Complainant to travel).

Complainant "assumed" that they (Complainant) knocked on Respondent's door, but could not remember clear details. Once inside, Respondent asked if Complainant wanted to sleep over, which Complainant understood meant to "cuddle." Complainant said they believed that they wore Respondent's shirt and boxers to sleep (Respondent denied that he owned boxers).

Respondent "kept trying to reach under" Complainant's clothes and said, "sleep with me," which Complainant interpreted to mean that Respondent wanted to have sex. Complainant told him "no." Complainant explained to the panel that Respondent was "so drunk" and "sloppy" that it made Complainant feel "uncomfortable"; while Complainant "normally" did not feel "physically afraid" of him, Complainant was "more so" when Respondent was "sloppy" and "touching [them]."

Respondent was touching and kissing Complainant's face and neck, and touching their breasts, legs, buttocks, and genital area over their clothes. Complainant told him, "I'm not okay with this. You are really drunk." Complainant also "kept saying 'no'" and telling him to "stop." Respondent was on top of Complainant and "between [their] legs," and Complainant felt like they "couldn't move." Respondent was then also touching Complainant breasts under their shirt (they were not wearing a bra) and was touching the front part of their genital area (Complainant was not sure if it was under or over their clothes). (In their second interview, Complainant said that the genital

---

[3] Respondent suggested that Complainant's medication may have interacted with alcohol, which "might have affected something that night." However, there was no evidence of this.
[4] Complainant initially did not share with the panel that they had been walking to Lewis Library with Student H and Student G, but in their second interview, they recalled doing so.

touching was both over and under their underwear and it occurred multiple times). The touching was occurring "intermittently," and Complainant "probably" told him to stop "at least ten times" in various ways, including "sorry, but you're really drunk right now," "I'm not okay with this," "I'm not comfortable with this," "can we not do this," "stop," and "no."

At one point, Respondent stopped and asked Complainant if what he was doing was "sexual assault."[5] It was like a "realization about what he was doing and he was upset about it." Because Complainant didn't want to "upset Respondent further," Complainant replied "no," even though they "should have answered yes." At that point, Respondent stopped and said something like, "I smell gross," to which Complainant responded, "yeah, why don't you take a shower and we can go to sleep."

Respondent went to take a shower[6] and Complainant pretended to be asleep, facing the wall, "in the hopes" that Respondent "wouldn't continue" when he returned. However, Respondent started kissing and touching Complainant under their clothes on the breast and "possibly" the genital area.[7] Complainant said, "Seriously, can we not? You are drunk. I don't want to do this." However, Respondent "continued to try to hook up," and Complainant "continued to tell him 'no' in various ways" for about an hour. Respondent was saying that he could not go to sleep because he was "turned on," so Complainant had told him "multiple times" that he should "go jack off."[8] Respondent finally went to the bathroom, but Complainant was not sure whether he actually "jack[ed] off."[9]

Complainant remembered Respondent waking up the next morning, but Complainant fell back asleep. When Complainant woke up again, Respondent had left for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Complainant provided the panel with a journal entry (electronically dated November 5 at 12:35 am), which read (in relevant part):

- Woke up at 11:40am or so in Respondent's room and got called by Student L saying that they were on campus with Student M
  - Told them I'd just woken up rip [sic] and they said it was okay and they had to get downcampus anyway
- Tried to intercept them at door so I could prox them in but apparently they somehow managed to sneak in and were already at my door

---

[5] According to Respondent, there was a time (though not in November) during which he and Complainant were having sex "after a few drinks" and Respondent said, "is this sexual assault?" However, he meant it in "a sort of dark humor way" like, "I'm drunk, would this be sexual assault because you are having sex with me when I'm drunk?"

[6] Respondent said that he does not like to take a shower when he is drunk; he just likes to go to bed.

[7] Complainant told the panel that they could not remember whether there was digital penetration, but there was no intercourse. Complainant further stated that because they did not "clearly" remember, they did not raise this allegation with the panel because they thought it would be "unfair to bring that up."

[8] Complainant did not initially mention masturbation but did so upon reviewing their journal entry, which referenced Respondent "taking care of himself in the bathroom."

[9] According to Respondent, it "happened a few times" that Complainant told Respondent to go "jerk off" so he wouldn't be "walking around horny."

4

A second entry (electronically dated November 5, 2017 at 1:25 am), read:

- 3:10 am: Stopped by Respondent's room because he had my toothbrush.
- ended up staying but also he was pretty drunk and it was kind of annoying and weird because he kept coming on to me and I was like dude can we not
    - sent him to go take a shower then pretended to sleep by time he got back in hopes he would just go to sleep
        - it did not work alas
- told him to go take care of himself in the bathroom at like 4 am then we finally went to sleep

Respondent's Account of November 4, 2017 Incident

In summary, Respondent denied that he saw Complainant after leaving the ███ party and denied that they engaged in sexual activity on the night in question.

During his first interview, Respondent denied that Complainant came to his room after the party to pick up their toothbrush: he said that he was "certain" that Complainant did not go into his room that night and they were "never alone together" on November 4, 2017. Consequently, Respondent denied that he and Complainant engaged in sexual activity in the early morning of November 4, 2017: he said he was "certain" that they did not "hook up" that night.[10] He said that the touching and kissing "sound like any other time [they] hooked up," but "not the 'no' part," and he "never pressured" Complainant into "having sex."

During his second interview, Respondent confirmed that "if some type of encounter happened, [he] would have remembered," he remembered the night "very clearly," and what he told the panel before was "accurate."

During his second interview, Respondent was provided with the prox records (see below). He said that he did not know why his room door would have been opened at 3:19 am for about a minute, and he did not know what he would have been doing. He initially told the panel that he did not go anywhere from the time he entered his room until ███ the following morning; he subsequently said that maybe he went to the kitchen down the hall. Respondent also said that if someone had knocked, he would have heard it because he was in a single, unless he was in the bathroom (which was part of his room) and that it was "possible" Complainant could have gone to his room to pick up the toothbrush between 3:19 and 3:20 am and that Respondent "simply didn't remember" the interaction.

Respondent said that he "didn't know how to explain" the records showing that Complainant entered Respondent's building at 3:14 am and did not return to their dormitory room until 12:05 pm.

Respondent said that other than "some sort of coincidence," he "couldn't explain the records." He suggested that perhaps Complainant went to the University Store, that Complainant met someone

---

[10] Respondent said that the previous night, Complainant consensually engaged in oral sex in Complainant room, after which they went to Respondent's room to sleep.

5

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

else and they let Complainant into another building, that Complainant was outside, or that Complainant slept somewhere outside of the dorms. He said, "I'm sorry ... I understand what it looks like, but I don't know... I wish I knew but I don't."

Respondent reiterated in his final written statement that he did not know "where [Complainant] went that night, with whom, or why, but they did not by any means come to my room. It is not unusual for [Complainant] to sleep in other places outside his own room, and it is a fact of the matter that my dormitory connects to five other dormitories – including his own – that wouldn't require a proxy for entry through the basement."

Prox Records

The (relevant) prox records indicated that on November 4, 2017:

- At 3:07 am, Respondent proxed into ▮▮▮ (Respondent's dormitory).
- At 3:07 am, Respondent used ▮▮▮ (an elevator in Respondent's dormitory).
- At 3:08 am, Respondent used the key and keypad to enter his dormitory room.
- At 3:14 am, Complainant proxed into ▮▮▮ (Respondent's dormitory)[11]
- At 3:14 am, Complainant used ▮▮▮ (an elevator in Respondent's dormitory).
- From 3:19 am to 3:20 am, the door to Respondent's dormitory room was open.
- At 7:31 am and again at 8:10 am, Respondent used the key and keypad to enter his dormitory room.[12]
- At 12:04 pm, Complainant used the ▮▮▮ (an elevator in Complainant's dormitory).
- At 12:05 pm, Complainant used the key and keypad to enter Complainant's dormitory room.

Aftermath

*February 2018 Conversation between Complainant and Respondent*

According to Complainant, in February of 2018, Complainant learned that Respondent was dating Student C,[13] so Complainant decided to talk to Respondent about the incident so that he could "be aware of it in future relationships." During their conversation, Respondent told Complainant that he did not remember that night; however, Complainant was not sure whether he was referring to the night overall or referring to Complainant saying "no." When Complainant asked for an apology, Respondent said it was "a lot to take in," he needed some time to process what Complainant had said, and he said something like, "I'm sorry for all the various hurts I've caused you."

---

[11] Respondent explained that this entry is his building, but it is the "far opposite hall" from where his room is.
[12] Respondent was unable to explain why he would have re-entered his room twice in the morning.
[13] In a February 26, 2018 message to Student C, Complainant wrote, "I wanted to warn you and tell you to be careful because he's sexually assaulted me multiple times."

6

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

In a journal entry (electronically dated February 28, 2018 at 6:14 pm), Complainant wrote:

> Just talked to Respondent about the sexual assault thing. He took it remarkably well. Well I mean like, I'm not sure what I expected, but whether he agreed or not, he at least wasn't flippant about it. In the end just before he left, I asked him for an apology for the sexual assault and he didn't give it to me because he said he still needed to talk about it, which I think makes sense? I mean like, to me it's still fairly clearly sexual assault and it's not really okay for him to think it's not sexual assault, but I'd rather not have an empty apology. It'd be pretty pointless. In the end, he said "I'm sorry for all the hurts I've caused you" or something kind of blanket-y and non-specific like that. I really hope that he gets it.

According to Respondent, during this conversation, Complainant said that Respondent had "sexually assaulted [Complainant] multiple times," that they would lay down and Complainant would say "no" and Respondent kept going, or that Complainant would sometimes just "eventually concede to get it over with." Complainant also mentioned a time in November where Respondent had been drunk and "pinned Complainant down" and had sex with Complainant. Although Respondent "disagreed in [his] head" with Complainant's account that he had "pressured him multiple times," he did not tell Complainant that he disagreed; rather, he tried to just listen and said, "okay, continue." Eventually, Complainant said, "can I be a dick for a minute? Can I ask you to apologize?" Respondent told Complainant that he "needed time to think," and said, "can I think about it?", as he hadn't wanted to apologize for something he did not do.

*Complainant's Communications with Others*

Complainant spoke to several individuals regarding the incident:

- According to Student B, in November of 2017, Complainant told her that they had been at a party, after which Respondent was drunk and "forced himself" on Complainant, although Complainant kept saying "no"; after Respondent kept "pressing [Complainant]," Complainant just "gave in" to sex. Student B said that Complainant used the word "rape" to describe the encounter (which Complainant denied): Complainant described that Respondent was on top of them, Complainant just "gritted [their] teeth until it was over." and "Respondent rolled off".
- According to Student A, in November of 2017, Complainant told him that he had been "sexually assaulted" but did not provide details, other than that the encounter started consensually, but at a certain point, Complainant told Respondent, "I don't want this." In subsequent conversations, Complainant told Student A that they told Respondent to "stop" multiple times. Complainant used the words "sex without [their] consent" multiple times, and it was Student A's impression that they had sexual intercourse.
- According to Student D, during their first December conversation, Complainant told him that Respondent was drunk and although Complainant told Respondent that Complainant was not interested in sex, "Respondent kept going." During a subsequent conversation, Complainant told Student D that Complainant told Respondent "no" to sex, Respondent kept going, Respondent asked Complainant "if it was an assault," and Complainant responded "no" but "regretted" their response. Complainant told Student D that there may

7

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

have been "fingering." Student D said that he "gathered" from their conversation that Complainant "gave in" at some point to having sex and "figured it was not worth it" to try to resist, and that Complainant said they [Complainant] "might as well enjoy it" since Complainant "couldn't stop it." In a March 24, 2018 message with Student D, Complainant wrote that they "can't remember if he actually specifically penetrated me or not So I'm charging for sexual assault and not rape … Like I think he fingered me but he might not've".

- According to Student H, in December of 2017, Complainant told her that in early November, Complainant and Respondent were "making out" in Complainant' room and then moved to Respondent's room because he had a bigger bed. Respondent wanted to continue to engage in sexual activity, but Complainant twice said "no," until a third time when Complainant finally said "yes." During a March of 2018 conversation, Complainant told Student H that Respondent "pinned [them] down during the encounter and Complainant was "scared" because Respondent was physically bigger.
- According to Student E, in various conversations, Complainant told her that Respondent was "really drunk" and Complainant stayed to "keep an eye on him." Respondent "pinned [Complainant] down on the bed" and initiated sexual activity, including "fingering." Complainant kept saying "no," but Respondent "would not stop."
- According to Student K, Complainant told her (in approximately January of 2018) that Respondent asked Complainant "is this sexual assault" and Complainant responded "no"; that Complainant eventually stopped saying "no" to sex and "let it happen," as Complainant was scared to say "no" to sex due to Respondent's "anger problems." Student K said that in a later conversation, Complainant clarified that there was no sexual intercourse, "only fingering."
- On March 6, 2018, Complainant sent an email to ten mutual friends ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ with the subject "not okay with seeing Respondent right now/potentially near future". It stated, in relevant part,

> Please don't invite me to things/give me a heads up if you know Respondent is going to be somewhere. I talked to him last Tuesday about his sexually assaulting me and Student C talked to him today about his talking to me and he told her that I never said no and that everything we did was consensual.
>
> This was after I'd made it very very clear that I'd said no *multiple* times and that he hadn't respected that and after he didn't seem to get *that*, I reminded him of the most clear-cut example that I could think of off the top of my head about how I was actually physically afraid the last time that we slept together (not in a sexual way ironically) because he was drunk and pinning me down and kept going when I was telling him no, at which point he himself had asked "Is this sexual assault?" I'd told him "no" at that time because I didn't want to deal with his anger/upset especially while he was drunk but I really should've said yes.
>
> Frankly I don't want him near any of you either because its' dangerous if he doesn't consider that sexual assault …

8

- In a March 25, 2018 text message with Complainant, Student C wrote, "for what it's worth he said he didn't remember the time he was drunk. That was when you kept saying no right?" to which Complainant responded, "well I mean there were multiple times but that was the only time I was actually really afraid." Later in the message chain, Complainant wrote, "he literally pinned me down and was touching me when I was saying no and curling up and trying to turn away from him". In a --- text message to Student C, Complainant wrote that "maybe digital penetration if that counts, but I don't plan to bring that up." Complainant explained to the panel that they "could not remember for sure" whether that happened, so they thought it would be "unfair to bring that up."

*Respondent's Communications with Others*

- According to Student G, in December of 2017, after Complainant told him that Respondent had "sexually assaulted" them in early November, Student G told Respondent about Complainant' allegations. Respondent was "completely shocked" and said that their sexual encounters were "always completely consensual." Respondent also told him that their last sexual encounter was on November 2, 2017, when Complainant gave him a "blow job" in Complainant's dormitory room.
- According to Student C, she had multiple conversations with Respondent about Complainant's allegations. Respondent told her that he never sexually assaulted Complainant. He told her that regarding the "pinning down" encounter, he was "drunk" and "might not have remembered the encounter at all." He told Student C that he did not pin Complainant down, but said that he and Complainant often had sex when he was drunk and that sometimes he did not remember what happened during the encounters. He said that the encounter "may have happened," but he could not remember and was "sure" that they agreed not to have sex during the week in question. Respondent also told her that he "vaguely" remembered a sexual encounter when he and Complainant were having sex and he asked Complainant, "in a joking manner," "if this was sexual assault"; he was asking if Complainant was assaulting him since he (Respondent) was intoxicated.[14] In a March 24, 2018 message with Student D, when asked what Respondent told her about the situation, Student C wrote, "there was a night when Respondent was drunk and they were sleeping together."
- According to Student H, in a March 2018 conversation with Respondent and Student G, Respondent said that "everything was always consensual" with Complainant. He said that Complainant either never returned to his room to retrieve the toothbrush or he was asleep when Complainant arrived.

  b. **Credibility Assessment**

The panel found Complainant's account to be more credible than that provided by Respondent.

*Complainant*

---

[14] Respondent was provided with information regarding his right to pursue a Title IX investigation; he declined to do so.

9

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

The panel found Complainant's account to be credible for the following reasons: Complainant's account of returning to Respondent's room and sleeping there was supported by the prox records; Complainant's account of going to Respondent's room to retrieve their toothbrush was supported by Complainant's 3:11 am text message to Respondent, as well as by Student H's and Student G's accounts; and Complainant's November 5, 2017 journal entries were consistent with the account Complainant provided to the panel.

The panel noted some concerns related to Complainant's account; however, as described below, the panel credited Complainant's explanations regarding these concerns:

- The panel noted that some of Complainant's friends provided inconsistent accounts of what Complainant told them regarding the encounter with Respondent. That is, Student B, Student A, Student D, and Student K all had the impression that Complainant and Respondent engaged in sexual intercourse, and Student H and Student K had the impression that Complainant initially said "no" and then said "yes" (Student H) or "let it happen" (Student K). However, the panel credited Complainant's explanation that those references were to prior occasions that were "more of a gray area" in which Complainant felt that they were saying "no" to Respondent but that sexual intercourse happened.[15] The panel found reasonable that it may not have been clear to these individuals that Complainant was referring to multiple different incidents.
- The panel also noted that Complainant provided varying accounts to witnesses regarding whether digital penetration occurred. However, the panel credited Complainant's explanation that they did not clearly remember whether digital penetration occurred, and thus did not raise this allegation with the panel because they thought it would be "unfair to bring that up."
- The panel noted that Student H did not describe Respondent as being very intoxicated, which was contrary to Complainant's description. However, the panel credited the explanation that Complainant provided to Student C in an (undated) text message, stating that Complainant "assumed [Respondent] was drunk because of how much he smelled and how sloppy he was and how he didn't listen to my no's."

*Respondent*

The panel credited that in December of 2017, Respondent told Student G that his last sexual encounter with Complainant involved having oral sex in Complainant's room, which was consistent with what Respondent told the panel. However, overall, the panel did not find Respondent's account to be credible. Most significantly, Respondent's account was discredited by the prox records, which indicated that Complainant entered Respondent's dormitory and took the elevator in his dormitory mere moments before Respondent opened his room door, and that Complainant did not return to Complainant's room until the following day. These records were entirely *consistent* with Complainant's account and entirely *inconsistent* with Respondent's account. The panel did not credit Respondent's various suggestions that perhaps Complainant

---

[15] Complainant did not wish to pursue Title IX investigations regarding these allegations. As they explained, while the prior occasions were "more of a gray area," this time Complainant was "definitely saying 'no,'" and Respondent "still didn't respect that." Complainant said that what differentiated the November incident was that Complainant "consistently said 'no' and never changed that," which was different from prior instances.

10

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

went to the University Store, that Complainant met someone else and they let Complainant into another building, that Complainant was outside, or that Complainant slept somewhere outside of the dorms.

In addition, the panel noted that the account that Respondent provided to his girlfriend (Student C, whose support of Respondent's account was apparent throughout the investigation) was consistent with Complainant's account (that Respondent was intoxicated) and was inconsistent with what Respondent told the panel. Specifically, Respondent told the panel that his alcohol consumption "didn't impair his memory" and he "remembered everything clearly" (except "maybe small details" such as who was at the party). He further told the panel that he had consistently been "clear" with others that he "remembered everything." However, Student C reported that Respondent told her that with respect to the "pinning down" encounter, he was "drunk" and "might not have remembered the encounter at all"; he said that the encounter "may have happened," but he could not remember. (In his third interview, Respondent said that when he said this to Student C, he was referring to an earlier encounter with Complainant).

*Others*

The panel noted that the parties' friends were very involved with this matter and appeared to "take sides" based on their friendships. However, the panel agreed that all of these individuals were generally credible with respect to their accounts regarding what they observed and what they were told by the parties.

    c. **Deliberations**

In deliberating, the panel considered the following University policies:

- Non-Consensual Sexual Penetration (commonly referred to as rape): Any act of vaginal or anal penetration by a person's penis, finger, other body part, or an object, or oral penetration by a penis, without consent.

- Non-Consensual Sexual Contact (commonly referred to as sexual assault): Any sexual touching other than non-consensual sexual penetration without consent. Examples of non-consensual sexual contact may include: genital-genital or oral-genital contact not involving penetration; contact with breasts, buttocks, or genital area, including over clothing; removing the clothing of another person; and kissing.

- Consent and Incapacitation: In reviewing possible violations of sexual misconduct, the University considers consent as the voluntary, informed, un-coerced agreement through words and actions freely given, which a reasonable person would interpret as a willingness to participate in mutually agreed-upon sexual acts. Consensual sexual activity happens when each partner willingly and affirmatively chooses to participate.

    Indications that consent is not present include: when physical force is used or there is a reasonable belief of the threat of physical force; when duress is present; when one person overcomes the physical limitations of another person; and when a person is incapable of

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

making an intentional decision to participate in a sexual act, which could include instances in which the person is in a state of incapacitation.

Important points regarding consent include:

- Consent to one act does not constitute consent to another act.
- Consent on a prior occasion does not constitute consent on a subsequent occasion.
- The existence of a prior or current relationship does not, in itself, constitute consent.
- Consent can be withdrawn or modified at any time.
- Consent is not implicit in a person's manner of dress.
- Accepting a meal, a gift, or an invitation for a date does not imply or constitute consent.
- Silence, passivity, or lack of resistance does not necessarily constitute consent.
- Initiation by someone who a reasonable person knows or should have known to be deemed incapacitated is not consent.

Section 1.3.3 of *Rights, Rules, Responsibilities*.

### i. Non-Consensual Sexual Contact

With respect to this charge of Non-Consensual Sexual Contact against Respondent, the panel considered whether, using the preponderance of the evidence standard, there was sufficient evidence to substantiate that Respondent non-consensually kissed Complainant, touched their breasts (above and below their shirt), touched their buttocks (over their clothing), and touched their genital area (above and below their clothing).

As described above, the panel found Complainant to be more credible than Respondent. As described above, an important part of this assessment was that the prox records (as well as the 3:11 a.m. text message and Student H's and Student G's accounts) fully supported Complainant's account of Complainant's whereabouts on the night in question and they discredited Respondent's account, demonstrating to the panel that Respondent either did not recall the night as well as he claimed to or he was deliberately lying to the panel. The panel noted that Respondent could have chosen to acknowledge that Complainant came to his room but that the sexual activity was consensual; however, Respondent contended that Complainant did not come to his room at all—a claim that the panel found to be demonstrably false. Therefore, the panel credited Complainant's account of their interactions on the night in question.[16] Specifically, the panel credited that Respondent repeatedly and over an extended time period non-consensually kissed Complainant's face and neck, touched their breasts (both over and under Complainant's shirt), buttocks, and genital area (both over and under Complainant's underwear).[17]

By Complainant's account, Complainant verbally indicated their lack of consent to Respondent "at least ten times." In addition, Complainant said that after Respondent took a shower,

---

[16] In doing so, the panel rejected Respondent's contention that he and Complainant did not engage in any sexual activity on the night in question.

[17] The panel recognized that in their first interview, Complainant said they were "not sure" whether the genital touching occurred above or below their clothing. However, in their second interview, they confirmed that the touching was both above and under their underwear.

12

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

Complainant was facing the wall, pretending to be asleep; a reasonable person in Respondent's position would not have interpreted Complainant's position as signaling a willingness to participate in mutually agreed-upon sexual acts.

The panel noted that Respondent asserted in his final written statement (for the first time) that Complainant's dorm connected underground to Respondent's dorm. However, even if Complainant did go underground from Respondent's room to their own room (which is contrary to Complainant's account), that still does not account for the fact that there was no prox record of Complainant entering their (Complainant's) room after any failed attempt to retrieve their toothbrush or for Respondent's denial that Complainant went to his room to retrieve the toothbrush (which, as described above, is supported by the prox records, 3:11 am text message, and Student H's and Student G's accounts).

The panel noted that by Complainant's account, Respondent asked at one point if this was "sexual assault" and Complainant said "no." The panel agreed that Complainant's response did not negate their multiple clear verbal indications that they did not consent to Respondent's touching. Moreover, the panel noted that by Respondent's account, Respondent made this comment on a different night (and was referring to Respondent being intoxicated); thus, he did not contend that he understood Complainant's response (that it was not sexual assault) to indicate consent.

Based on the information before us, and using the preponderance of the evidence standard, the panel found sufficient information to substantiate the charge of Non-Consensual Sexual Contact against Respondent. The panel therefore unanimously found Respondent *responsible* for Non-Consensual Sexual Contact, in that he non-consensually repeatedly kissed Complainant's face and neck, touched their breasts (both over and under Complainant's shirt), buttocks, and genital area (both over and under Complainant's underwear).

### ii. Non- Consensual Sexual Penetration

With respect to this charge of Non-Consensual Sexual Penetration against Respondent, the panel considered whether, using the preponderance of the evidence standard, there was sufficient evidence to substantiate that Respondent digitally penetrated Complainant's vagina.

Complainant consistently told the panel that they were uncertain regarding whether digital penetration occurred; Complainant also echoed this in (late March of 2018) text messages with Student D and Student C. However, Complainant's friends, Student D, Student E, and Student K, all reported that they understood from Complainant that "fingering" occurred. When asked in their second interview about this inconsistency, Complainant said, "If they're saying what they're saying from a conversation I had earlier, then I would trust that more than what I'm saying right now, because I remembered then."

Based on the information before us, including Complainant's acknowledged uncertainty regarding what occurred, and using the preponderance of the evidence standard, the panel found insufficient information to substantiate the charge of Non-Consensual Sexual Penetration against Respondent. The panel therefore unanimously found Respondent *not responsible* for Non-Consensual Sexual Penetration.