

| | Ira S. Nesenoff | Barbara H. Trapasso | Philip A. Byler |
| --- | --- | --- | --- |
| | Andrew T. Miltenberg | Gabrielle M. Vinci | Diana R. Warshow |
| | | Cindy A. Singh | Kara L. Gorycki |
| | Stuart Bernstein | Nicholas E. Lewis | Amy Zamir |
| | Tara J. Davis | Regina M. Federico | Susan E. Stark |
| | | Kristen E. Mohr | Janine L. Peress |
| | | Suzanne Dooley | *Senior Litigation Counsel* |

Jeffrey S. Berkowitz
Rebecca C. Nunberg
*Counsel*

Marybeth Sydor
*Title IX Consultant*

ATTORNEYS AT LAW

nmllplaw.com

June 16, 2022

<u>**VIA ECF**</u>
Hon. Zahid N. Quraishi, U.S.D.J.
U.S. District Court
District of New Jersey
Clarkson S. Fisher Building
402 East State Street
Trenton, NJ 08608

Re:   *John Doe v. Princeton University, et al.,* **Civil Case No.: 3:19-cv-07853-ZNQ-TJB**
<u>**Notice of Supplemental Authority**</u>

Judge Quraishi:

Please be advised that the undersigned represents John Doe ("Plaintiff") in the above referenced matter. The undersigned respectfully requests leave of this Court to submit supplemental authority regarding Defendants renewed Motion to Dismiss fully submitted to the Court on April 21, 2021. This matter was reassigned to Your Honor on June 29, 2021.

Plaintiff respectfully submits the following relevant authority, *Doe v. University of Denver* Case No.: 20CA1545 U.S. Court of Appeals for the Tenth Circuit, order dated May 26, 2022, attached hereto as Exhibit A ("Ex. A") as supplemental authority for the within case.

Plaintiff respectfully requests that the Court consider this recent authority.

        **Respectfully submitted,**
        **NESENOFF & MILTENBERG, LLP**

        By: <u>*/s/ Diana R. Warshow*</u>
           Andrew T. Miltenberg, Esq.
           Diana R. Warshow, Esq.
           Amy J. Zamir, Esq.

# EXHIBIT A

2022 WL 1670545

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION IN THE PERMANENT LAW REPORTS. A PETITION FOR REHEARING IN THE COURT OF APPEALS OR A PETITION FOR CERTIORARI IN THE SUPREME COURT MAY BE PENDING.

Colorado Court of Appeals, Division VII.

John DOE, Plaintiff-Appellant,
v.
UNIVERSITY OF DENVER; University of Denver Board of Trustees; Rebecca Chopp, individually and as an agent for University of Denver; Kristin Olson, individually and as an agent for University of Denver; Jean McAllister, individually and as an agent for University of Denver; Siri Slater, individually and as an agent for University of Denver; Eric Butler, individually and as an agent for University of Denver, Defendants-Appellees.

Court of Appeals No. 20CA1545
|
Announced May 26, 2022

City and County of Denver District Court No. 19CV33640, Honorable Morris B. Hoffman, Judge

**Attorneys and Law Firms**

Campbell Killin Brittan & Ray, LLC, Michael Mirabella, Denver, Colorado, for Plaintiff-Appellant

Constangy, Brooks, Smith & Prophete, LLP, Jimmy Goh, Erin Mangum, Denver, Colorado, for Defendants-Appellees

**Opinion**

Opinion by JUDGE BERGER

¶ 1 John Doe appeals the district court's summary judgment in favor of the University of Denver (DU), its board of trustees, and the individuals responsible for the investigation and adjudication that culminated in John's expulsion for non-consensual sexual contact with Jane Roe.[1]

¶ 2 This case requires us to decide two questions of first impression in Colorado. First, are DU's *Office of Equal Opportunity Procedures 2015-2016* (Aug. 17, 2015), https://perma.cc/6TDL-4M6S (OEO Procedures), regarding student sexual misconduct investigations sufficiently definite to be enforceable in contract? Second, what tort duties, if any, does a private educational institution owe its students when investigating and adjudicating claims of sexual misconduct by its students?

¶ 3 We hold that DU's OEO Procedures regarding student sexual misconduct investigations are sufficiently certain to be enforced under Colorado contract law. We also hold that a private educational institution owes a duty, independent of any contractual promises, to adopt fair procedures and to implement those procedures with reasonable care when investigating and adjudicating claims of sexual misconduct by one student against another. We also hold, however, that a university's trustees, employees, and agents do not owe this tort duty.

¶ 4 Accordingly, we affirm in part and reverse in part the district court's judgment and remand for further proceedings.

Doe v. University of Denver, --- P.3d ---- (2022)
2022 COA 57

I. Relevant Facts and Procedural History

**\*2** ¶ 5 We glean the following facts from multiple sources, including John's, Jane's, and other witnesses' written submissions to DU, the correspondence between John and DU's investigators, and the facts found in the final investigation report. No evidentiary hearing on the disputed facts was ever held. We recite these facts solely to guide our legal analysis; none of the stated facts is binding on the district court on remand.

A. John and Jane's Relationship

¶ 6 In fall 2015, John and Jane enrolled as undergraduate students at DU. In January 2016, they began a romantic relationship in which they sometimes spent the night with each other but did not engage in sexual intercourse. In February 2016, the relationship cooled, and they interacted with each other less often.

¶ 7 On a Friday in early March 2016, Jane was drinking alcohol with friends in a dorm and later at a bar. Jane wanted to talk to John, so after Jane returned to the dorm where both she and John lived, she attempted to locate John. After finding John in his friend's dormroom, where he had also been drinking alcohol, Jane brought him to her dormroom. They began kissing and engaging in sexual contact but did not engage in sexual intercourse that night.

¶ 8 John and Jane dispute the events that occurred the following morning. John claimed that he awoke to find Jane on top of him attempting to engage in intercourse. They then engaged in consensual sexual intercourse "for a very brief time." At some point, Jane abruptly left the room. About ten minutes later, she returned and wanted to talk about their relationship. John was unwilling to discuss their relationship and returned to his room.

¶ 9 Jane's version of the Saturday morning events differed materially. She said that she woke up naked to find John fondling her genitals and kissing her. She claimed that John then had sexual intercourse with her without her consent.

¶ 10 After hearing John discuss the incident with others at a party and after returning from spring break to discover that John had told additional people about their sexual encounter, Jane filed a complaint with DU's Office of Equal Opportunity (OEO).[2]

B. The OEO Procedures

¶ 11 As part of the enrollment process, John received a copy of the OEO Procedures. The OEO Procedures provide that DU will make an initial assessment when a report alleges a violation of a DU policy. OEO Procedures at XI.A. "Where the initial assessment concludes that Corrective Action and/or Outcomes may be appropriate, [DU] will initiate an investigation." *Id.* at XI.E.

¶ 12 The OEO Procedures require DU to designate either an employee of DU or an external investigator to conduct the investigation. *Id.* They require that "[a]ny investigator chosen to conduct the investigation must be impartial and free of any actual conflict of interest." *Id.* The OEO Procedures contain various provisions designed to ensure that an investigation is "thorough, impartial and fair." *Id.*

¶ 13 At the conclusion of the investigation, the investigator must prepare a "written report that summarizes the information gathered and synthesizes the areas of agreement and disagreement between the parties." *Id.* at XI.F. In preparing the report, "the investigator will review all facts gathered to determine whether the information is material to the determination of responsibility given the nature of the allegation. In general, the investigator may exclude information that is immaterial." *Id.* Before the report is finalized, the complainant and respondent are given an opportunity to review the preliminary report and offer oral and written comments. *Id.*

*3 ¶ 14 Upon receipt of additional information from the complainant or respondent, "the investigator will make a finding as to whether there is sufficient information to establish, by a preponderance of the evidence, that a policy violation occurred. The final written report will include the determination of responsibility and the rationale for the determination." *Id.*

¶ 15 "When there is a determination of responsibility for a policy violation[,] the [OEO] will refer the matter to the appropriate administrator for Corrective Action or Outcomes." *Id.* at XI.H.1. If the respondent is a student, the matter is then referred to the Outcome Council. *Id.* at XI.I. The OEO Procedures direct the Outcome Council to "mak[e] a neutral and impartial review of investigations and findings, and impos[e] outcomes (sanctions)." *Id.* at XIII.B.1. "In general[,] violations of the non-consensual sexual contact provision of [the OEO] Procedures typically result in a dismissal ...." *Id.* at XIII.D. Once the Outcome Council renders a finding, it issues a letter describing the outcome and appeal options. *Id.* at XIII.E. The OEO Procedures provide that "[a]ppeal decisions are final." *Id.* at XIII.F.

C. The Investigation

¶ 16 On March 24, 2016, the OEO received Jane's complaint. The Title IX Coordinator reached out to Jane that same day and held an informational meeting with her in early April. On April 12, Jane requested a formal investigation.

¶ 17 In late April, the Title IX Coordinator gave John notice of Jane's allegations and issued a "no contact order" to John.[3] John submitted to a formal interview with the investigators in early May. John provided the names of five people he wanted the investigators to interview: his mother, his legal counsel, his therapist, and two students. In addition to Jane and John, the investigators interviewed eleven witnesses whom Jane had identified.

¶ 18 Before submitting her complaint to the OEO, Jane underwent a sexual assault nurse examination (SANE). During the investigation, she submitted portions of the SANE report. The portions she submitted described a dozen observable abrasions and contusions on her body. Jane did not submit, however, (1) photographs of her abrasions and contusions; (2) summaries by the SANE nurse or the attending physician; or (3) her written statement to the SANE nurse regarding the source of her injuries. The portions of the SANE report that Jane submitted did not include any medical analysis as to the possible cause or age of her injuries.

¶ 19 Though the preliminary report is not in the record, the final report states that John and Jane "were given the opportunity to review the preliminary report and offer any factual clarifications and additional relevant information related to the statements." After he reviewed the investigators' preliminary report, John realized that the investigators had not interviewed *any* of his witnesses and again requested that the investigators interview them. The investigators then interviewed one of John's witnesses — his therapist.

¶ 20 The investigators declined to interview the other witnesses John identified even though some of those witnesses — students — were in the dormroom with him when Jane came and brought him back to her dormroom on the night in question. The final report stated that interviews of John's witnesses were unnecessary because "the [i]nvestigators had already interviewed witnesses [who] could corroborate the information that [John] expected them to provide."

*4 ¶ 21 The final report further acknowledged that Jane had not produced the complete SANE report but nevertheless concluded that the portions of the report she had submitted corroborated Jane's version of events.

¶ 22 The final report concluded, "it is more likely than not that [John] engaged in non-consensual sexual contact with [Jane] on the morning in question."

¶ 23 Shortly after the final report was issued, John was informed that the Outcome Council "determined that dismissal is the only reasonable outcome" and that his dismissal from DU was effective immediately.

¶ 24 John appealed, alleging that the investigators' "strong bias" affected their ability to conduct a "fair and equal investigation." He also alleged that the outcome was "disproportionate to the violation." John's appeal was denied, constituting "a final decision, with no further route of appeal."

D. The Federal and State Lawsuits

¶ 25 Following his expulsion, John sued DU, its trustees, and the individuals responsible for the investigation and adjudication in the United States District Court for the District of Colorado. He pleaded federal claims, including a violation of his rights under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688. See *Doe v. Univ. of Denver*, Civ. A. No. 17-cv-01962, 2019 WL 3943858, at *3 (D. Colo. Aug. 20, 2019) (unpublished opinion), *rev'd and remanded*, 1 F.4th 822 (10th Cir. 2021). He also pleaded state law claims for breach of contract, breach of the covenant of good faith and fair dealing, promissory estoppel, and negligence. *Id.*

¶ 26 After the federal district court granted summary judgment on the federal claims in favor of all defendants and dismissed the state law claims without prejudice, John filed the lawsuit underlying this appeal in Denver District Court, raising the same four state law claims he originally brought in federal court.

¶ 27 The defendants moved for summary judgment on all claims, which the district court granted. As to John's contract claim (including his claim for breach of the duty of good faith and fair dealing), the court concluded that DU's promise of a "thorough, impartial and fair" investigation was too vague to be enforced. The district court also rejected John's negligence claim, holding that DU did not owe John an "extra-contractual duty to non-negligently investigate claims of sexual assault by one student against another."[4] John appeals.

¶ 28 After completion of briefing in this court, the United States Court of Appeals for the Tenth Circuit reversed the federal district court's grant of summary judgment, holding that genuine issues of material fact precluded summary judgment on John's Title IX claim against DU. *Doe v. Univ. of Denver*, 1 F.4th 822, 825 (10th Cir. 2021). The Tenth Circuit's opinion identified several inconsistencies and deficiencies in DU's investigation of John and concluded that there were genuine issues of material fact as to whether DU's investigation discriminated against John based on sex in violation of Title IX. *Id.* at 832-34.[5]

II. Standard of Review

**\*5** ¶ 29 We review summary judgments de novo. *Westin Operator, LLC v. Groh*, 2015 CO 25, ¶ 19, 347 P.3d 606. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." C.R.C.P. 56(c); *see also Mullen v. Metro. Cas. Ins. Co.*, 2021 COA 149, ¶ 14, 507 P.3d 73.

III. The OEO Procedures are Sufficiently Definite and Certain to be Enforced Under Colorado Contract Law

¶ 30 John claims that DU violated its OEO Procedures and thereby breached its contract with him by failing to conduct a "thorough, impartial and fair" investigation. *See* OEO Procedures at XI.E. He also claims that DU violated the implied covenant of good faith and fair dealing.

¶ 31 The fundamental question presented to us is whether the term in the OEO Procedures providing for a "thorough, impartial and fair" investigation is sufficiently definite to be enforceable in contract.

¶ 32 While no Colorado appellate court has addressed this question, other courts have. Some courts have concluded that contractual terms like "fundamental fairness" and "basic fairness" are sufficiently definite and certain to be enforced under contract law. *See Goodman v. President & Trs. of Bowdoin Coll.*, 135 F. Supp. 2d 40, 57 (D. Me. 2001); *see also Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 572 (D. Mass. 2016).

Doe v. University of Denver, --- P.3d ---- (2022)
2022 COA 57

¶ 33 Other courts have concluded that general statements promising a safe and healthy workplace or that dissertation committee members would be involved in a "very active manner" are insufficiently certain to be enforced under contract law. *See Vasey v. Martin Marietta Corp.*, 29 F.3d 1460, 1465 (10th Cir. 1994); *Borwick v. Univ. of Denver Bd. of Trs.*, Civ. A. No. 11-cv-01216, 2013 WL 1149543, at *8 (D. Colo. Mar. 18, 2013) (unpublished opinion), *aff'd*, 569 F. App'x 602 (10th Cir. 2014).

¶ 34 The district court in this case reasoned that the term "thorough, impartial and fair" was not sufficiently definite to create an enforceable contract under Colorado law. Based on the specific investigation and adjudication procedures contained in the OEO Procedures, including the words "thorough, impartial and fair," we disagree.

A. Contract Law

¶ 35 To recover for breach of contract, a plaintiff must prove (1) the existence of a contract; (2) the plaintiff's performance or some justification for nonperformance; (3) the defendant's failure to perform; and (4) damages to the plaintiff.[6] *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).

¶ 36 Colorado appellate courts have recognized that "[t]he basic relationship between a student and an educational institution is contractual in nature." *CenCor, Inc. v. Tolman*, 868 P.2d 396, 398 (Colo. 1994); *see also Davis v. Regis Coll., Inc.*, 830 P.2d 1098, 1100 (Colo. App. 1991). "Materials actually provided to a student, including enrollment agreements and catalogs, may become part of the agreement." *CenCor*, 868 P.2d at 398. But contract claims regarding "the general quality of educational experiences provided to students have generally been rejected." *Id.*

**\*6** ¶ 37 "If the parties fail to agree to sufficiently definite and certain terms, there is no meeting of the minds and, hence, no valid contract." *Schmidt v. Frankewich*, 819 P.2d 1074, 1077 (Colo. App. 1991). On the other hand, contract terms that are "sufficiently definite to enable the court to determine whether the contract has been performed or not" are enforceable. *Stice v. Peterson*, 144 Colo. 219, 224, 355 P.2d 948, 952 (1960) (quoting *Newton Oil. Co. v. Bockhold*, 115 Colo. 510, 518, 176 P.2d 904, 908 (1946)).

¶ 38 Contract interpretation is a question of law that we review de novo. *Ad Two, Inc. v. City & Cnty. of Denver*, 9 P.3d 373, 376 (Colo. 2000). "The primary goal of contract interpretation is to determine and give effect to the intent of the parties. The intent of the parties to a contract is to be determined primarily from the language of the instrument itself." *Id.* (citation omitted). When interpreting a contract, all terms must be viewed in the context of the contract as a whole. *Cary v. United of Omaha Life Ins. Co.*, 108 P.3d 288, 293 (Colo. 2005). Contract language "must be examined and construed in harmony with the plain and generally accepted meaning of the words employed." *AdTwo, Inc.*, 9 P.3d at 376. "The meaning of a contract is found by examination of the entire instrument and not by viewing clauses or phrases in isolation." *U.S. Fid. & Guar. Co. v. Budget Rent-A-Car Sys., Inc.*, 842 P.2d 208, 213 (Colo. 1992).

B. The OEO Procedures on Investigations

¶ 39 Section XI.E of the OEO Procedures provides as follows:

> The investigation is designed to provide a fair and reliable gathering of the facts. *The investigation will be thorough, impartial and fair, and all individuals will be treated with appropriate sensitivity and respect.* ...

> The investigator will conduct interviews as necessary, review documents, and any other relevant information concerning the alleged discriminatory acts. The parties may provide any relevant information to the investigator, including the names of witnesses to contact and/or documents to review at any time before the investigation is closed. The Complainant and Respondent will have an equal opportunity to be heard, to submit information, and to identify witnesses who may have relevant information. Witnesses must have observed the acts in question or have information relevant to the incident and

cannot be participating solely to speak about an individual's character. Investigators will review and determine the weight and materiality of all submitted information and including the necessity of interviewing potential witnesses.

....

After [DU] decides to move forward with an investigation and the complainant's initial interview is completed, the Respondent will be notified by Title IX or Equal Opportunity staff that an investigation has been initiated. They will be notified in writing and invited to an informational meeting to review the process and the resources available to them throughout the process. ...

After the respondent has completed the informational meeting or the initial ten (10) business days from receiving notice have passed, the respondent will be invited to complete an initial interview with an investigator. ...

In most cases, investigators will have follow-up questions for the complainant and respondent after their respective initial interviews. ...

**\*7** (Emphasis added.)

C. Application

¶ 40 The words "thorough," "impartial," and "fair" are not defined in the OEO Procedures' definitional section. But that does not end our inquiry. Instead, when we examine the entire document, rather than view the words "thorough, impartial and fair" in isolation, we are able to ascertain the parties' intent. The specific investigation requirements give meaning to the words "thorough, impartial and fair" and are sufficiently definite to determine whether the contractual terms have been performed or breached.

¶ 41 Consider the following provision in the OEO Procedures: "The Complainant and Respondent will have an equal opportunity to be heard, to submit information, and to identify witnesses who may have relevant information." OEO Procedures at XI.E. Evidence that the investigators interviewed eleven of the witnesses Jane identified but only one of the five witnesses John identified might allow a fact finder to conclude that DU breached its contractual promise of a "thorough, impartial and fair" investigation.

¶ 42 The United States District Court for the Eastern District of Pennsylvania engaged in a similar analysis. *Doe v. Trs. of the Univ. of Pa.*, 270 F. Supp. 3d 799, 813-14 (E.D. Pa. 2017). The University of Pennsylvania's disciplinary procedures promised a "thorough and fair investigation" and a "fair and impartial" hearing. *Id.* at 813. Because the promise of a "thorough and fair investigation" was "immediately followed by a description of the precise procedures that the investigating officer and his team w[ould] follow," the court concluded that the investigation the parties contemplated was that set forth in the procedures immediately following the promise of such an investigation, even though the promise of a "thorough and fair investigation" and a "fair and impartial" hearing may not have been, by themselves, sufficiently certain to support a breach of contract claim. *Id.* at 813-14.

¶ 43 Applying principles of Colorado contract law to construe DU's promise of a "thorough, impartial and fair" investigation with reference to the entirety of the OEO Procedures related to investigations, we conclude that the contractual term providing for a "thorough, impartial and fair" investigation is sufficiently definite and certain to be enforced.

¶ 44 In resolving this question, we need not decide, and therefore express no opinion, whether the terms "thorough," "impartial," and "fair," standing by themselves, would be sufficiently certain and definite to be enforceable under Colorado contract law. *See Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 217-18 (D. Mass. 2017) (denying the defendants' motion for judgment on the pleadings because the plaintiff alleged sufficient facts from which the court could plausibly infer that the investigation was inadequate under policies that promised a "thorough, impartial and fair" investigation).

¶ 45 We also do not identify which specific investigation procedures inform the contractual term providing for a "thorough, impartial and fair" investigation. Our holding is limited to concluding that the contractual term providing for a "thorough,

impartial and fair" investigation, coupled with the prescribed investigation requirements, is sufficiently definite and certain to be enforced under Colorado contract law.

D. Genuine Issues of Material Fact Precluded Summary Judgment on John's Contract Claim Against DU

**\*8** ¶ 46 Having concluded that the OEO Procedures are sufficiently definite to be enforced in contract, we turn to whether the record permitted summary judgment in favor of DU on John's contract claim. We hold that it did not.

¶ 47 At the outset, we note that the Tenth Circuit's opinion in *Doe* held that summary judgment was improperly granted on John's Title IX claim; neither the federal district court nor the Tenth Circuit addressed John's state law claims. 1 F.4th at 825.

¶ 48 Nevertheless, at least some of the factual questions relevant to John's Title IX claim are equally relevant to his state law claims, as he argued on appeal to us. And although we are not bound by the Tenth Circuit's analysis in *Doe*, either under the law of the case doctrine or otherwise, we conclude that its analysis is persuasive and relevant to our consideration of whether genuine issues of material fact preclude summary judgment in this case. *See Monez v. Reinertson*, 140 P.3d 242, 245 (Colo. App. 2006) ("[W]e are not bound by decisions of lower federal courts."); *Kuhn v. State, Dep't of Revenue*, 897 P.2d 792, 795 (Colo. 1995) (explaining the law of the case doctrine).

¶ 49 First, John alleges (and the record supports the allegation) that the investigators did not consider Jane's possible improper motivations for filing the complaint against John. As the Tenth Circuit noted, Jane admitted to investigators that she filed her complaint only after learning that John had allegedly told other classmates about their sexual encounter. *Doe*, 1 F.4th at 833. Jane initially did not tell her classmates she thought the encounter was a sexual assault or nonconsensual; "[i]t was not until later — after Jane saw John talking to another young woman at a party — that she began telling people the encounter was not consensual." *Id.* So far as the record reveals, the investigators apparently did not consider or address in the preliminary or final reports any of these motivations for a sexual assault charge.

¶ 50 Second, John points to the eleven witnesses whom the investigators interviewed at Jane's request. Through the preparation of the preliminary report, DU rejected John's request to interview *any* of his proposed witnesses. Only after issuance of the preliminary report and John's second request that his supporting witnesses be interviewed did the investigators interview *one* of his five requested witnesses: his therapist. The OEO Procedures state that the "Complainant and Respondent will have an equal opportunity to be heard, to submit information, and to identify witnesses who may have relevant information." OEO Procedures at XI.E.

¶ 51 As the Tenth Circuit persuasively explained, two of the witnesses whom John requested be interviewed were his roommate and one of his close friends, both of whom he told about the sexual encounter "very shortly after it happened." *Doe*, 1 F.4th at 832. Perhaps more importantly, these same witnesses also had "witnessed interactions between John and Jane in the hours surrounding the alleged assault." *Id.* The potential relevance of information provided by such witnesses is obvious.

¶ 52 The investigators' final report dismissed out of hand the potential significance of these witnesses' knowledge, stating that John's roommate and friend would likely only provide "duplicative" information and the investigators wanted to limit those interviewed given the private nature of the issues. But, again, as the Tenth Circuit reasoned, "the same could be said for Jane's eleven witnesses [whom] investigators opted to interview." *Id.* We therefore conclude that there is a genuine issue of material fact as to whether John received an "equal opportunity to be heard, to submit information, and to identify witnesses who may have relevant information." *See* OEO Procedures at XI.E.

**\*9** ¶ 53 The failure of the investigators to consider Jane's entire SANE report also gave the Tenth Circuit pause. We acknowledge that DU may not have had legal authority to compel production of the full SANE report. But the fact that the investigators relied on selective portions of the SANE report (chosen by Jane) to reach the conclusions in the final report has obvious consequences regarding the reliability of the findings made in reliance on the incomplete SANE report. As the Tenth Circuit observed, a complete SANE report includes "summaries by the SANE nurse, the attending physician, and the patient's written statement regarding the source of the injuries." *Id.* at 833. The investigators did not consider any of this

information because Jane elected not to provide it.

¶ 54 Although the final report acknowledged that Jane had not provided the complete SANE report, it nevertheless relied on the self-selected portions of the SANE report, stating that it "seem[ed] to corroborate [Jane's] assertion that [John] was 'manipulating' her body by 'grabbing and pushing' her legs aside before forcibly putting his penis inside her." The final report concluded that the information from the SANE that Jane provided corroborated her version of events but discounted other SANE information that might have been included as speculative. But without the other information not produced — specifically a medical cause for her injuries and a date of injury — it is at least open to question by a fact finder whether the investigators and DU thoroughly, impartially, and fairly "review[ed] and determine[d] the weight and materiality of all submitted information" as section XI.E of the OEO Procedures required.

¶ 55 We reject DU's argument that John has presented no facts, other than his mere disagreement with the result of the investigation, to support his breach of contract claim. Instead, we hold that the arguable deficiencies in DU's investigation identified above and in *Doe* create genuine issues of material fact as to whether DU abided by its contractual commitments to provide a "thorough, impartial and fair" investigation as provided in the OEO Procedures before it expelled John based on its finding that he had engaged in non-consensual sexual contact.[7]

E. Genuine Issues of Material Fact Precluded Summary Judgment on John's Contract Claim Against DU Premised on a Breach of the Duty of Good Faith and Fair Dealing

¶ 56 A breach of the implied covenant of good faith and fair dealing is one way that a party can breach a contract. *See City of Golden v. Parker*, 138 P.3d 285, 292 (Colo. 2006). The implied covenant of good faith and fair dealing applies to every contract in Colorado. *Cary v. United of Omaha Life Ins. Co.*, 68 P.3d 462, 466 (Colo. 2003). The duty of good faith and fair dealing applies "when the manner of performance under a specific contract term allows for discretion on the part of either party." *Parker*, 138 P.3d at 292 (quoting *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995)). "Whether a party acted in good faith is a question of fact which must be determined on a case by case basis." *Amoco Oil Co.*, 908 P.2d at 499.

¶ 57 As illustrated above, many of the OEO Procedures allow for DU's investigators to act with discretion. For example: "Investigators will review and determine the weight and materiality of all submitted information and including the necessity of interviewing potential witnesses." OEO Procedures XI.E.

*10 ¶ 58 For the same reasons identified above, *see supra* Part III.D, we conclude that genuine issues of material fact precluded summary judgment on John's breach of contract claim premised on a breach of the duty of good faith and fair dealing.

¶ 59 We therefore reverse the district court's judgment dismissing John's contract claim (including his claim based on breach of the covenant of good faith and fair dealing) and remand for further proceedings, including, if necessary, a jury trial.

IV. Colorado Law Recognizes a Tort Duty of Care Owed by DU

¶ 60 John asserts, as he did in the district court, that DU owed him a tort duty of care, independent of DU's contractual obligations, to adopt fair procedures and to implement those procedures with reasonable care when it investigated and adjudicated the allegations against him. The district court held that no such duty exists under Colorado law and granted summary judgment to all defendants on that basis.

¶ 61 We disagree with the district court as to DU and hold that it owed John that duty of care. We also conclude that genuine issues of material fact precluded summary judgment on his negligence claim. But, because we agree with the district court that the trustees, employees, and agents owed no tort duty of care, we affirm the summary judgment as to them.

Doe v. University of Denver, --- P.3d ---- (2022)
2022 COA 57

A. Applicable Law

¶ 62 As discussed above, we review summary judgments de novo. *Westin*, ¶ 19.

¶ 63 To prevail on a claim that a person breached a duty of care, a plaintiff must prove that (1) the defendant owed the plaintiff a duty of care; (2) the defendant breached that duty; (3) the plaintiff suffered an injury; and (4) the cause of the injury was the defendant's conduct. *Id.* at ¶ 23. "Whether a defendant owes a legal duty to a plaintiff is a question of law." *Id.* at ¶ 18.

¶ 64 In a series of cases, the Colorado Supreme Court has identified a nonexhaustive list of public policy factors that bear on whether Colorado law recognizes a duty of care in tort. *Id.* at ¶¶ 25, 33; *HealthONE v. Rodriguez*, 50 P.3d 879, 888 (Colo. 2002); *Greenberg v. Perkins*, 845 P.2d 530, 536 (Colo. 1993); *Taco Bell, Inc. v. Lannon*, 744 P.2d 43, 46 (Colo. 1987); *Univ. of Denver v. Whitlock*, 744 P.2d 54. 57 (Colo. 1987).[8]

¶ 65 To determine whether a duty should be recognized, we assess (1) the risk involved in the defendant's conduct; (2) the foreseeability and likelihood of injury weighed against the social utility of the defendant's conduct; (3) the magnitude of the burden of guarding against the injury; and (4) the consequences of placing the burden on the defendant. *Westin*, ¶ 33; *HealthONE*, 50 P.3d at 888. As the supreme court has said, no one single factor is dispositive, as "the question of whether a duty should be imposed in a particular case is essentially one of fairness under contemporary standards — whether reasonable persons would recognize a duty and agree that it exists." *Taco Bell*, 744 P.2d at 46. We address each factor in turn.

B. DU Owed John a Duty of Care in Investigating and Adjudicating the Allegations of Non-Consensual Sexual Contact[9]

1. Application of the *Westin* Factors

a. The Risk Involved in DU's Conduct

*11 ¶ 66 The risks involved in investigating and adjudicating claims of non-consensual sexual contact are palpable and severe. A mere allegation of sexual misconduct can be devastating to the accused. A determination that a person engaged in non-consensual sexual contact can potentially destroy the accused's educational, employment, and other future prospects. Here, DU found John responsible for non-consensual sexual contact.

¶ 67 The OEO Procedures outline the range of possible outcomes when a policy violation is found, stating that "violations of the non-consensual sexual contact provision of these Procedures typically result in a dismissal." OEO Procedures at XIII.D. A student who is dismissed "is permanently prohibited from participating in any University activities, academic or otherwise, and will be restricted from all University Premises and activities." *Id.* Additionally, "Student Conduct files of students who have been dismissed from the University will be kept indefinitely" and may be provided to educational institutions, employers, or others. *Id.* at XIII.H.

¶ 68 We are hard pressed to find another activity by a private educational institution that can be so devastating and long-lasting in the life of a student.

Doe v. University of Denver, --- P.3d ---- (2022)
2022 COA 57

b. The Foreseeability and Likelihood of Injury Weighed Against the Social Utility of DU's Conduct

¶ 69 Injuries resulting from procedurally faulty investigations and adjudications of allegations of non-consensual sexual contact are foreseeable and likely. Under the foreseeability factor, "it is not necessary that the tortfeasor be able to foresee the exact nature and extent of the injuries or the precise manner in which the injuries occur, but only that some injury will likely result in some manner as a consequence of his negligent acts." *HealthONE,* 50 P.3d at 889. Indeed, here, such injury to a student resulting from a negligently handled investigation is foreseeable. "When a university levies charges against a student without proper investigation or allows a biased committee to decide the student's guilt, the foreseeability of harm to the student is great." Scott R. Sinson, Note, *Judicial Intervention of Private University Expulsions: Traditional Remedies and a Solution Sounding in Tort*, 46 Drake L. Rev. 195, 226 (1997).

¶ 70 A student who is dismissed after the culmination of a partial or unfair investigation will likely suffer a diminished earning capacity and stigma from the expulsion, and may be prevented from engaging in their chosen profession. *See Jansen v. Emory Univ.*, 440 F. Supp. 1060, 1062 (N.D. Ga. 1977) ("Since his dismissal, the plaintiff has applied to and been rejected by every dental school in the United States, Canada and Puerto Rico."), *aff'd*, 579 F.2d 45 (5th Cir. 1978).

¶ 71 On the other hand, the social utility of investigations and adjudications of allegations of non-consensual sexual contact is significant. Private educational institutions have a substantial interest in protecting their students and preventing those who engage in non-consensual sexual contact from using their facilities or interacting with other students.

¶ 72 Congress enacted Title IX with the express goal that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX's implementing regulations provide a grievance process for formal complaints of sexual harassment. 34 C.F.R. § 106.45 (2021).

**\*12** ¶ 73 When we weigh the significant foreseeability and likelihood of injury against the significant social utility, we conclude on balance that "the seriousness of the potential harm militates in favor of imposing a duty." *Westin*, ¶ 35.

c. The Magnitude of the Burden of Guarding Against the Injury

¶ 74 The magnitude of the burden imposed on DU of guarding against the injury is significant. Training employees to use fair procedures in investigating and adjudicating allegations of non-consensual sexual contact and overseeing such investigations and adjudications demands both economic and personnel resources.

¶ 75 Accordingly, this factor weighs against recognizing a duty of care.

d. The Consequences of Placing the Burden on DU

¶ 76 In applying this factor, the *Taco Bell* court explained that the consequences of placing the burden of taking reasonable measures to protect restaurant patrons from criminal acts of third persons "would result in some economic burden on Taco Bell and a predictable corresponding increase to customers in the cost of Taco Bell's food products." 744 P.2d at 49. The reasonable measures in *Taco Bell* included "making sure the restaurant is well illuminated, installing highly visible video cameras, keeping small amounts of cash in the registers, posting signs," training employees, and locking doors at night. *Id.* The court concluded it was equitable for the costs of these reasonable measures to "be borne by the owner, operator, and, indirectly, the customers of the restaurant." *Id.*

¶ 77 Likewise, here, the burden of imposing a duty to use fair procedures when investigating and adjudicating claims of improper sexual conduct by students will undoubtedly result in an economic and personnel burden on DU. For example, DU might be required to provide additional training and resources to, and maintain oversight over, its employees, particularly

because the investigations may be lengthy and the persons conducting them must exercise discretion in the performance of their duties. As in *Taco Bell*, it is equitable for these costs to be borne by DU and, indirectly, DU's students. Just as Taco Bell was the only actor able to take reasonable measures to protect patrons from the criminal acts of third persons, DU is the only actor able to ensure that its investigation and adjudication of a student are fair and impartial.

¶ 78 The consequences of placing the burden on DU weigh in favor of recognizing a duty to adopt fair procedures and to implement those procedures with reasonable care in the investigation and adjudication of allegations of non-consensual sexual contact.

e. Weighing of the Relevant Factors

¶ 79 Although the magnitude of the burden of guarding against the injury is significant, it does not outweigh the severe risk of harm inherent in DU's conduct, the foreseeability and likelihood of injury to a student weighed against the social utility of DU's conduct, and the consequences of placing the burden on DU. Accordingly, we apply supreme court case law on this question and conclude that DU had a duty to adopt fair procedures and to implement those procedures with reasonable care in the investigation and adjudication of allegations that John committed non-consensual sexual contact.[10]

2. Cases from Other Jurisdictions Support our Conclusion and Those that Don't are Distinguishable

**\*13** ¶ 80 No Colorado appellate court has previously addressed whether a duty of care arises in these circumstances. But courts in other jurisdictions have. Those courts have found the consequences of adjudications of far less serious misconduct sufficient to support the imposition of a tort duty of care.

¶ 81 In the academic misconduct context, the United States Court of Appeals for the Sixth Circuit reversed summary judgment on the plaintiff's claim, holding that the gravity of the harm posed by the professor's grading system was severe and that "a wrongful conviction by a disciplinary committee could ruin a student's chances of admittance to graduate school." *Atria v. Vanderbilt Univ.*, 142 F. App'x 246, 252 (6th Cir. 2005). The risks involved in investigating and adjudicating claims of non-consensual sexual contact are far more severe than the risks posed by the professor's grading system in *Atria*.

¶ 82 Apparently applying factors similar to those set forth by the Colorado Supreme Court in *Westin*, the United States District Court for the Eastern District of Tennessee denied the defendants' motion for summary judgment on the plaintiff's negligence claim because "a jury could find that the harm caused by the University's allegedly and arguably haphazard implementation of its own Sexual Assault Policies was foreseeable, especially where ... the harm was severe: a wrongful conviction by a disciplinary committee." See *Doe v. Univ. of S.*, No. 4:09-CV-62, 2011 WL 1258104, at \*21 (E.D. Tenn. Mar. 31, 2011) (unpublished opinion).

¶ 83 Other courts have dismissed tort claims by students claiming they were wrongly disciplined for sexual misconduct and that the educational institutions did not properly apply their policies, concluding that the defendants owed the students no duty of care. *Doe v. Columbia Coll. Chi.*, 299 F. Supp. 3d 939, 962 (N.D. Ill. 2017), *aff'd*, 933 F.3d 849 (7th Cir. 2019); *Jackson v. Liberty Univ.*, No. 6:17-CV-00041, 2017 WL 3326972, at \*9 (W.D. Va. Aug. 3, 2017) (unpublished opinion); *Amherst Coll.*, 238 F. Supp. 3d at 228.

¶ 84 Those courts largely rely on the common law principle that, absent a special relationship, a party owes no duty of care to protect another from the harmful or criminal acts of third persons. *Columbia Coll. Chi.*, 299 F. Supp. 3d at 962; *Jackson*, 2017 WL 3326972, at \*9; *Amherst Coll.*, 238 F. Supp. 3d at 228.

¶ 85 Those cases are inapposite because John does not allege that DU had a duty to protect him from the harmful or criminal acts of third persons. Instead, he alleges that DU itself harmed him by negligently conducting the investigation and

Doe v. University of Denver, --- P.3d ---- (2022)
2022 COA 57

determining that he engaged in non-consensual sexual contact.

¶ 86 Even assuming these cases rejected the imposition of a duty owed to a student being disciplined due to a negligent investigation, the supreme court has provided binding guidance on the relevant factors to be applied to ascertain whether such a tort duty exists. *Westin*, ¶ 25.

3. DU's Arguments Do Not Support the District Court's Dismissal of the Tort Claim Against DU

¶ 87 We reject DU's argument that a duty of care should not be recognized because "tort obligations generally arise from duties imposed by law to protect citizens from risk of physical harm or damage to their personal property." *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 72 (Colo. 2004). DU ignores the word "generally" in that quote. It is indisputable that certain types of nonphysical harm (like reputational harm) may be as devastating or serious as physical harm. *See, e.g.*, *Gordon v. Boyles*, 99 P.3d 75, 79 (Colo. App. 2004) (holding that an allegation of an extramarital affair is an allegation of serious sexual misconduct and, therefore, defamatory per se). This is such a situation, and the "general" rule does not prohibit the recognition of a tort duty in these circumstances.

*14 ¶ 88 DU also relies on *Williams v. Continental Airlines, Inc.*, 943 P.2d 10, 15-16 (Colo. App. 1996), for the proposition that Colorado does not recognize the tort of negligent investigation. *Williams* was an employment case; it did not address a duty that an educational institution may owe its students. Moreover, the *Williams* division did not consider the factors the Colorado Supreme Court articulated to determine the existence of a duty in tort. We are bound by opinions of the Colorado Supreme Court, not opinions of another division of this court. *See In re Estate of Ramstetter*, 2016 COA 81, ¶ 40, 411 P.3d 1043; *Campbell v. People*, 2020 CO 49, ¶ 41, 464 P.3d 759. We must apply the *Westin* factors.

¶ 89 We also reject DU's argument that "[t]he sole purpose of DU's investigation into Jane's allegations against John was for the benefit of either [DU] or Jane." *See Columbia Coll. Chi.*, 299 F. Supp. 3d at 963. This view of the investigation and adjudication misses the relevant point entirely. When a university adjudicates allegations of non-consensual sexual contact, the consequences of that determination rest almost entirely on the student found responsible. We acknowledge that the purpose of the investigation can also be for the benefit of either DU or Jane (or both). But the burden and detriment of an unfair investigation and adjudication is borne almost entirely by John.

¶ 90 Nor are we prohibited from recognizing a duty of care in non-consensual sexual contact investigations and adjudications because of the courts' uniform rejection of educational malpractice claims. *See, e.g.*, *Tolman v. CenCor Career Colls., Inc., Div. of CenCor, Inc.*, 851 P.2d 203, 205 (Colo. App. 1992) (holding that there is no cause of action for educational malpractice), *aff'd sub nom. CenCor, Inc. v. Tolman*, 868 P.2d 396 (Colo. 1994). Requiring procedural fairness in the investigation and adjudication of allegations of non-consensual sexual contact has little or nothing to do with an amorphous claim of educational malpractice.

¶ 91 In this case, we determine as a matter of law that DU owed John a duty in that his "interest that has been infringed by the conduct of the defendant is entitled to legal protection." *HealthONE*, 50 P.3d at 888 (quoting *Metro. Gas Repair Serv., Inc. v. Kulik*, 621 P.2d 313, 317 (Colo. 1980)).

¶ 92 For all of these reasons, we conclude that DU had a duty to adopt fair procedures and to implement those procedures with reasonable care in the investigation and adjudication of the allegations against John.[11] If DU adopts fair procedures and implements those procedures with reasonable care, the outcome of the investigation and adjudication is not open to question.

C. The Individual Defendants Did Not Owe John a Duty of Care in Investigating and Adjudicating the Allegations of Non-Consensual Sexual Contact

Doe v. University of Denver, --- P.3d ---- (2022)
2022 COA 57

1. Application of the *Westin* Factors

**\*15** ¶ 93 In considering the first three *Westin* factors as to DU's trustees, employees, and agents, we come to the same conclusion that we did with respect to DU. But, unlike our conclusion that the consequences of placing the burden on DU weighed in favor of recognizing a duty, we conclude that the consequences of placing the burden on the individual defendants strongly weighs against recognizing a tort duty.

¶ 94 Unlike DU (or Taco Bell), the individual defendants have no opportunity to pass on the costs of this significant burden. *See Taco Bell*, 744 P.2d at 49; *see also Skillett v. Allstate Fire & Cas. Ins. Co.*, 2022 CO 12, ¶ 16, 505 P.3d 664 (noting, in interpreting a statute, that it would be odd to impose liability on insurance adjusters to insureds where such adjusters are not party to the insurance policy). Additionally, the consequences of placing the burden on the individual defendants would only be of slight benefit because, as we have already concluded, that burden already lies with DU.

¶ 95 Accordingly, we conclude that this factor weighs against recognizing a duty of care.

2. Weighing the Relevant Factors

¶ 96 With respect to the individual defendants, although the risk and the foreseeability and likelihood of injury from an unfair investigation and adjudication remain high, the magnitude of the burden and the consequences of placing that burden on the individual defendants outweigh the other two factors. So, we conclude that the individual defendants did not owe John a duty of care.

¶ 97 Because the individual defendants did not owe John a duty of care, John's tort claim against the individual defendants necessarily fails and the district court correctly granted summary judgment to those defendants. *See Westin*, ¶ 23.

D. Genuine Issues of Material Fact Precluded Summary Judgment on John's Tort Claim Against DU

¶ 98 Having concluded that DU owed a duty of care in the course of its investigations and adjudications of allegations of non-consensual sexual contact, we turn to whether the record permitted summary judgment in favor of DU. We hold that it did not.

¶ 99 For many of the same reasons articulated above regarding genuine issues of material fact relating to the contract claim, including the Tenth Circuit's analysis of genuine issues of material fact related to John's Title IX claim, we conclude that genuine issues of material fact precluded summary judgment on John's tort claim against DU.

V. Disposition

¶ 100 The district court's summary judgment is affirmed in part and reversed in part. The district court's summary judgment dismissing John's contract claim against DU is reversed, as is the summary judgment dismissing John's tort claim against DU. The district court's summary judgment in favor of DU's trustees, employees, and agents is affirmed. The case is remanded for further proceedings consistent with this opinion.

JUDGE BROWN and JUDGE JOHNSON concur.

**Doe v. University of Denver, --- P.3d ---- (2022)**
2022 COA 57

**All Citations**

--- P.3d ----, 2022 WL 1670545, 2022 COA 57

Footnotes

1       John **Doe** and Jane Roe are pseudonyms used to preserve these persons' privacy. None of the parties challenges the propriety of using pseudonyms in litigation of this type. Respecting the party presentation principle, neither do we. *See Galvan v. People*, 2020 CO 82, ¶ 45, 476 P.3d 746.

2       This is the DU office that addresses claims under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, including claims by students that another student engaged in sexual misconduct.

3       None of the parties addresses whether a private educational institution has legal authority to impose a "no contact order," so we do not further address this question. *See Galvan*, ¶ 45.

4       The district court also granted summary judgment in favor of the defendants on John's promissory estoppel claim, but John does not appeal that portion of the court's order. Accordingly, we do not further address John's promissory estoppel claim.

5       Because the briefing in this court was completed before the Tenth Circuit announced its opinion in ***Doe* v. *University* of *Denver***, 1 F.4th 822, 825 (10th Cir. 2021), we requested that the parties address at oral argument the effects, if any, of the Tenth Circuit's opinion on our analysis and disposition of this appeal. They did so.

6       Under Colorado contract law, "[n]ominal damages are recoverable for a breach of contract even if no actual damages resulted or if the amount of actual damages has not been proved." *City of Westminster v. Centric-Jones Constructors*, 100 P.3d 472, 481 (Colo. App. 2003). This is in contrast to a tort claim, where damages are an essential element of the claim; if a plaintiff fails to prove damages in a tort case, judgment enters in favor of the defendant. *See, e.g.*, *Nunn v. Mid-Century Ins. Co.*, 244 P.3d 116, 121 (Colo. 2010) ("[A]s with most tort claims, proof of actual damages is an essential element of a bad faith breach of an insurance contract claim.").

7       We emphasize that we are not resolving any of these factual issues. We have identified factual questions regarding whether DU complied with its contractual commitments that require further proceedings. But it is for the district court or a jury, as appropriate, to resolve these factual questions on remand. We express no opinion on the ultimate resolution of these questions.

8       The General Assembly may, by legislation, establish an actor's duty of care and enact a statutory cause of action for breach of such a duty. *See, e.g.*, § 13-20-804, C.R.S. 2021; *A.C. Excavating v. Yacht Club II Homeowners Ass'n, Inc.*, 114 P.3d 862, 868 (Colo. 2005) ("[T]he General Assembly has explicitly recognized that subcontractors are under an independent duty of care."). The *Westin* factors come into play only when the General Assembly has not addressed the subject matter. Neither party claims that the General Assembly has enacted relevant legislation on this subject.

9       This case requires us to decide if DU owed a tort duty to John. We are not presented with a claim by Jane that DU owed any tort duty to her. Therefore, we express no opinion on whether DU owed a similar tort duty of care to an alleged victim of non-consensual sexual contact. Nevertheless, we recognize the substantial risks to both the alleged victim and the accused of an unfair investigation and adjudication.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.                                                              14

10      In *Westin Operator, LLC v. Groh*, 2015 CO 25, ¶¶ 32, 37, 347 P.3d 606, the supreme court relied both on the similarity of the innkeeper-guest special relationship to the hotel-guest relationship and the duty factors to conclude that "the Westin had a duty to exercise reasonable care while evicting Groh." In the context of rejecting a duty of care in a case involving a fraternity member using a trampoline at a fraternity house, which leased the property from DU, the Colorado Supreme Court held that "the student-university relationship is not a special relationship." *Univ. of Denver v. Whitlock*, 744 P.2d 54, 58, 61 (Colo. 1987) (quoting *Leake v. Cain*, 720 P.2d 152, 160 (Colo. 1986)). But, even absent a special relationship, we conclude that the duty factors weigh in favor of recognizing a duty of care by DU. *See Westin*, ¶ 25 (a duty can arise from the nature of the relationship between the parties, or application of public policy factors, or both); *see also HealthONE v. Rodriguez*, 50 P.3d 879, 888-90 (Colo. 2002) (finding a duty of care notwithstanding the fact that the plaintiff and physician did not have a physician-patient relationship).

11      In concluding that DU had a duty to adopt fair procedures and implement those procedures with reasonable care in the investigation and adjudication of allegations that John committed non-consensual sexual contact, we express no opinion on the applicability of the economic loss rule. Though the defendants cite *Town of Alma v. AZCO Construction, Inc.*, 10 P.3d 1256, 1262 (Colo. 2000), in their answer brief for the proposition that "[a] breach of a duty which arises under the provisions of a contract between the parties must be redressed under contract, and a tort action will not lie," they do not argue on appeal that the economic loss rule applies in this case. We do not address underdeveloped arguments. *Antolovich v. Brown Grp. Retail, Inc.*, 183 P.3d 582, 604 (Colo. App. 2007).

**End of Document**      © 2022 Thomson Reuters. No claim to original U.S. Government Works.